171 Cal.App.2d 651 (1959)
Estate of ELMER L. SANDERSON, Deceased. BALBENA S. SYSTER, as Administratrix, etc., Respondent,
v.
O'NEILL P. MARTIN, as Executor, etc., et al., Defendants; THE ROMAN CATHOLIC BISHOP OF SAN DIEGO, Appellant.
Civ. No. 5875. 
California Court of Appeals. Fourth Dist. 
July 1, 1959.
 Howard S. Dattan for Appellant.
 Robert A. Kaiser, Jeremiah F. O'Neill, Jr., and Kaiser & O'Neill for Respondent.
 SHEPARD, J.
 This is an appeal from a judgment and order denying admission to probate the will of Elmer L. Sanderson after jury verdict finding that on the day the instrument was executed the deceased, Elmer L. Sanderson, was not competent to make a will. Initially, the grounds of opposition to probate of the will included not only lack of competency of the deceased to make a will, but also that said document was not executed in the form and manner required by statute; that decedent died within 30 days of the execution of the document; that the document was within the purview of Probate Code, section 41; and that the document was not the free and voluntary act of the decedent, but the making and execution thereof was procured by undue influence. Prior to trial, the ground of undue influence was abandoned by contestant. During the trial and before the matter reached the jury for decision the trial court correctly ruled, as a matter of law, that the document conformed in form and manner to the requirements of statute. At the close of the evidence, prior to argument and jury instructions, the trial court correctly removed from the consideration of the jury the ground of opposition that the document was within the purview of Probate Code, section 41, and so instructed the jury.
 The will, subject of the contest herein, was executed by decedent on January 24, 1957. He died February 1, 1957 of coronary thrombosis. He was unmarried and left no issue. His only heir at law was his adult brother, Harvey W. Syster, the original contestant herein. From June 20, 1953, until his entry into a hospital on January 21, 1957, on a diagnosis of *654 heart trouble, the deceased lived in a rest home in San Diego, California. At the time of his death he was apparently of the approximate age of 75 years.
 In 1904, he was committed to a California State Hospital for the mentally ill on a diagnosis of religious mania, and less than a year later he was discharged. In 1922, he was again admitted to a state hospital for the mentally ill on a diagnosis of "dementia praecox hebephrenic." In 1926, he was discharged as improved. In 1936 he was appointed executor of his mother's estate by the probate court of Alameda County and apparently completed his duties therein. In 1941, a title company noted his record of commitment with no formal record of discharge and he appeared before the board of examiners of the state hospital. After examination he was formally discharged as recovered.
 The testimony indicates that he had approximately $27,000 in various building and loan deposits and owned some real estate and corporate stock. In 1955, he joined the Knights of Columbus, a fraternal organization, and in that connection met the attorney who drew his will in the hospital on January 24, 1957, at his request. The attorney had met him a number of times in a fraternal capacity, but had not served him in a legal capacity prior to the date of drawing the will. This attorney testified that he went to the hospital in response to a call to his father (also an attorney); that upon entering the room he found decedent sitting up on his bed, discussed with deceased who his relatives were and what his property was, and was told by deceased of the existence of a brother living in San Francisco (the original contestant); that the brother was well fixed and that he did not want to leave anything to him. The will was written in longhand by the attorney at the direction of deceased and was read back to deceased. The will was then and there executed by the deceased, the attorney and a companion attorney acting as subscribing witnesses, the testator and witnesses all being present during drafting, reading and execution of the will. The attorney took the will with him under directions to have a typewritten copy made and mailed to deceased at the rest home. Later, one of the residents of the rest home, at decedent's request, brought the typewritten copy of the will to decedent at the hospital. The will names Columbian Building Corporation of San Diego; The Roman Catholic Bishop of San Diego, Charles F. Buddy; Thomas Ackerman; St. Jude's Roman Catholic Church of San Diego; St. Ann's Roman Catholic Church of San Diego, as *655 the sole legatees. The two subscribing witnesses to the will, in addition to testifying about the conversation respecting deceased's property and relatives and what he desired to put into his will, testified that in their opinion at the time of the execution of the will the deceased was mentally competent and of sound mind. The physician who attended the deceased at the hospital, and who had been deceased's personal physician for some years preceding, testified that in his opinion deceased had the mental capacity to understand and recollect the nature and situation of his property and to remember and understand his relations to persons about him, the relatives or persons who might expect to benefit from his will, and that he believed deceased to be mentally competent. A deputy district attorney who had been acquainted with deceased for two or three years prior to his death gave similar testimony. The credit manager of the hospital related the business conversations of deceased, and stated he was clear and coherent in talking. The nurse who attended him during his stay in the hospital recounted her contacts and conversations with him, her ability to clearly understand him, that he was quiet, cooperative and gave her no reason to doubt his mental competency.
 Appellant contends that the court was in error in admitting testimony of the witnesses produced by contestant as intimate acquaintances. We see no merit in this contention. [1] As was said in Estate of Perkins, 195 Cal. 699, 710 [13] [235 P. 45]:
 "Whether or not a witness may testify as an intimate acquaintance is a question of fact for the trial court to determine. That court is vested with a wide discretion, and its determination is not subject to review unless the court has abused its discretion. Such an abuse is not here shown."
 Appellant next contends that the evidence produced by the contestant was insufficient to support the judgment. With this we agree. [2] Under the rule announced in Estate of Bristol, 23 Cal.2d 221, 223 [143 P.2d 689], we must, on appeal, view the evidence in the light most favorable to respondent. The witnesses for the contestant were six in number and were all residents with deceased at a rest home, either all or part of the three or four years he there resided. Because of our views of the ultimate conclusion to be reached in this cause, we find it desirable to briefly recount their testimony in the light most favorable to contestant, who is here the respondent.
 [3] Walter E. Lowe knew the testator for four and a half years, saw and observed him daily; ate with him in the same *656 dining room; observed him talking to other people; played shuffleboard with him; that he had no power of mind to carry on a conversation; he did not act naturally; he was destructive in pruning bushes and trees in the garden; he started a dangerous fire in the garden; he could not keep a shuffleboard score; he was emotional, moody and of unsound mind.
 John D. Greiner saw deceased practically every day during the time the deceased lived in the rest home; saw him at meal times, in the halls and in the garden; saw the deceased enter another man's room without permission; saw destructive pruning; saw unreasonable anger; witness once thought deceased was going to strike him.
 Richard N. Taylor knew deceased at the rest home about three years; ate at the same table; saw and observed him daily; deceased could not carry on a continuous coherent conversation; would wander off on some other subject; was ungrateful; threatened to beat him up when witness helped deceased move furniture; flew into a rage over nothing; would froth at the mouth; room like a pig pen; that he was irrational and had an unsound mind.
 Mrs. Frances P. Nelson knew deceased at the rest home about two years; worked in the garden with him; saw him daily; talked to him often; deceased could not carry on a continuous conversation; became irritated because she would not accept his religion; once thought he was bowing to the sun; that he appeared to be interested in a Hindu cult book; said he was going to start a new church; that his conduct was cyclical in nature; quiet and courteous at times and again discourteous and angry; she made basins around the rose trees; he leveled all the basins around the rose trees; mumbled to himself; cried; said he was a Catholic. She expressed her opinion on the foregoing that the deceased was irrational and of unsound mind.
 Mrs. Laura Baker, a practical nurse, worked at the rest home about two years; saw the deceased every day at least three times a day or oftener; talked with him little; he looked sick; held his hands over his head occasionally at meal time; apparently lacked gratitude; abruptness of speech; thought he was of unsound mind.
 Mrs. Sadie Lytel, superintendent of the rest home for about two years prior to death of deceased, saw him daily; once asked him to plant pansies and instead he planted petunias; when she made him dig them up he flew into a rage and *657 threatened to strike her; he had a very untidy room; she believed him to be of unsound mind.
 Viewed in the light most favorable to the respondent there was a complete absence of any evidence that the deceased at the time of making the will, or at any other time immediately preceding or succeeding its execution, was lacking in those qualities of mind necessary to make him competent in a testamentary capacity.
 In Estate of Perkins, supra, wherein the judgment of the trial court denying probate of a will was reversed, there was testimony that during the four years prior to testatrix' death her disposition was greatly changed; that she was highly irritable; extremely close in financial matters where she had previously been generous; suffered severe pain; required sedatives; sometimes had "starey" eyes; delirious; subject to hallucinations at times; forgetful of immediately passed events; had illusions about torn night clothing, impending marriage and trips to Europe; could not follow the reasoning of her financial adviser; was "clear off" at times; talked incoherently; that she was not of sound mind. The Supreme Court there said, with respect to this evidence, "It does not show that she was of unsound mind in the legal acceptation of the term at the time of the making of the will. [Citations.] And the question to be determined is not what might have been her mental condition, but what in fact was her mental condition at the time that she made the will."
 In Estate of Sexton, 199 Cal. 759 [251 P. 778], in which the order of the trial court in granting a new trial after the jury had returned a verdict upholding the will was reversed, the testimony showed the deceased was suffering from arterio sclerosis; that she had suffered paralytic strokes; gradually grew worse; mentally extremely weak; feeble minded; was not able to transact important business; easily influenced; failed to answer questions; irrational. [4] The Supreme Court there said:
 "Ability to transact important business, or even ordinary business, is not the legal standard of testamentary capacity; though it seems to be quite generally but mistakenly supposed, outside the ranks of the legal profession, that a capacity to transact important business is the criterion of fitness to make a valid will."
 In Estate of Wright, 7 Cal.2d 348 [60 P.2d 434], wherein the Supreme Court reversed the order of the trial court denying admission of a will to probate, the witnesses, including the *658 subscribing witnesses to the will, expressed the view that the testator was of unsound mind, giving as the reasons therefor that the testator was queer; that he did not have in mind the legal description of his property; that he had a serious operation; that his living quarters were dirty; that he gave a witness a fish soaked in kerosene; that he insisted on buying furniture not for sale; turned the hose on children; drunk much of the time; accidental injury to head seemed to change him; ran out of the house only partly dressed; picked up articles from garbage cans and hid them around the house; put paper flowers on rose bushes; left home without explanation; recovered gifts from donees without explanation; falsely told of fictitious gifts to donees; failed to acknowledge his grandson; held his breath and appeared to be dead; malingered in the use of a wheel chair; kept bottles under his bed; failed to buy medicine; failed to keep engagements; unkindly. [5] In speaking of this evidence as the basis of repeated statements of witnesses that he was of unsound mind, the court said:
 "The foregoing sets forth the full strength of contestant's case. Tested by the decisions of this court the judgment is wholly without evidentiary support. There is no evidence that testator suffered from settled insanity, hallucinations or delusions. Testamentary capacity cannot be destroyed by showing a few isolated acts, foibles, idiosyncrasies, moral or mental irregularities or departures from the normal unless they directly bear upon and have influenced the testamentary act."
 In Estate of Lingenfelter, 38 Cal.2d 571 [241 P.2d 990], in which the judgment of the trial court denying probate was reversed, the various witnesses based their testimony of unsoundness of mind on such factors as her being upset on the slightest provocation; that she would "disintegrate emotionally"; scream and yell; eyes become glassy; weep uncontrollably; weak will; easily led; extremely excitable; unreasonably jealous; psychoneurotic; severe pain in head; committed suicide. [6] In speaking of this evidence the Supreme Court said:
 "Accepting that construction of the evidence most favorable to Lenore it shows no lack of testamentary capacity at the time of the execution of the will presented for probate. There is testimony concerning isolated acts, foibles, idiosyncrasies, mental irregularities or departures from the normal which do not bear directly upon and influence the testamentary act. *659 But much more than that is required to set aside bequests of property. ..."
 " 'Testamentary capacity cannot be destroyed by showing a few isolated acts, foibles, idiosyncrasies, moral or mental irregularities or departures from the normal unless they directly bear upon and have influenced the testamentary act.' (Estate of Wright, 7 Cal.2d 348, 356 [60 P.2d 434] ... 'Care must be taken to differentiate between mere unreasonable opinions and mental derangements. Testamentary capacity does not depend upon the testatrix' ability to reason logically or upon her freedom from prejudice. A belief may be illogical or preposterous, but it is not, therefore, evidence of insanity.' "
 In Estate of Russell, 80 Cal.App.2d 711 [182 P.2d 318], in which the judgment annulling the probate of a will was reversed, the testimony of various witnesses that the deceased was of unsound mind was based on such matters as bad color; incoherent speech; unreasonable repetition; refusal to follow financial advice; bad physical condition; weakened condition, mentally in stupor; failure to recognize nurse; coma; failure to articulate properly; unable to understand explanations; and the like. [7] The appellate court, in speaking of this evidence, said:
 "While in the instant case, the testatrix was in feeble health, suffering from disease, aged and infirm, these facts are not sufficient of themselves to establish testamentary incapacity unless it be shown by a preponderance of the evidence that her condition of mind and body at the time of the execution of the will was such that she was unable to understand the nature and situation of her property and the disposing of it intelligently. ..."
 "Before a solemnly executed will may be set aside, the claimed infirmities of mind or body must be shown to have had a direct bearing upon the testamentary act, and the evidence must establish the fact that the deceased devised or bequeathed her property in a manner which, except for the claimed infirmities, she would not have done."
 In Estate of Llewellyn, 83 Cal.App.2d 534 [189 P.2d 822, 191 P.2d 419], in which the trial court's judgment in refusing to admit the will to probate was reversed, the evidence upon which the witnesses declared the testatrix incompetent was based on irritability; physical pain; poor memory; hazy; bad orientation; poor memory of business affairs; tired; sick; senile; confused; childish about his personal effects; and illusions *660 about cigaret burning in bed. [8] In holding that the evidence offered was insufficient as a matter of law to show incompetency as of the time the will was executed, the court said:
 "It is true of course that evidence of the condition of the testator's mind before and even after the date of the testamentary act was admissible, but it assumes importance only insofar as it bears upon that condition at the very time of the execution of the will. ..."
 [9] "The presumption always is that a person was of 'sound mind' at the time of the execution of his will, and the burden therefore always rests upon the contestants to show affirmatively, and by a preponderance of the evidence, the incapacity of the testator, and the further fact that except for alleged infirmities of mind or body, he bequeathed his property in a manner that he otherwise would not have done."
 In Estate of Selb, 84 Cal.App.2d 46 [190 P.2d 277], where the appellate court reversed a judgment denying probate of a will, the opinion of the witnesses that the testatrix was of unsound mind was based on such matters as that she was very old and had deteriorated mentally and physically; that she was very repetitious; forgetful; 93 years of age; very different than 60 years before; appeared to have failed mentally and physically; untidy; dirty; at times she would not recognize her friends; did not seem to remember one of her grandson's children; frail; and feeble. [10] The appellate court in speaking of the evidence said:
 "It has been held over and over in this state that old age, feebleness, forgetfulness, filthy personal habits, personal eccentricities, failure to recognize old friends or relatives, physical disability, absent-mindedness and mental confusion do not furnish grounds for holding that a testator lacked testamentary capacity. ... [11] It is well established that opinions of witnesses regarding the mental soundness or testamentary capacity of a testator are of no greater value than the reasons given in support of the opinions."
 Dozens of other expressions in different language by the courts of last resort have been enunciated, and all are consistent with the foregoing expressions. [12] In the case at bar, as in most of the cases hereinbefore cited, none of the witnesses testified as to the events at the time the will was executed nor of the testator's mental condition at that time. None of the witnesses in the case at bar related any events which had any tendency to show that the testator at the time *661 he made his will did not have a complete understanding of the character and condition of his property and of his relatives and persons who could expect to receive his testamentary favor. On the contrary, the testimony of the subscribing witnesses was to the effect that he knew and understood the condition of his property, remembered his brother who was his nearest relative but affirmatively decided his brother did not need help. He had been a member and attendant of the Catholic Church for a considerable time previous to his death, he had no other known close relatives, and we see nothing unnatural in the will itself.
 Our views hereinbefore expressed, that the evidence is as a matter of law insufficient to support the judgment, renders unnecessary any discussion of other points raised by appellant.
 At the conclusion of the evidence and prior to final argument proponent properly moved for a directed verdict, and after the verdict moved for a judgment notwithstanding the verdict.
 The judgment and order of the court refusing to admit the will to probate is reversed, with directions to admit the will to probate.
 Griffin, P. J., and Mussell, J., concurred.