239 Cal.App.2d 369 (1966)
Estate of JANE R. WYNNE, Deceased. KERN COUNTY HEART ASSOCIATION et al., Contestants and Appellants,
v.
BENNETT SIEMON et al., Proponents and Respondents.
Civ. No. 531. 
California Court of Appeals. Fifth Dist. 
Jan. 13, 1966.
 Di Giorgio, Davis & Nairn and Thomas R. Davis for Contestants and Appellants.
 Mack, Bianco & Means and Henry C. Mack, Sr., for Proponents and Respondents.
 CONLEY, P. J.
 When Jane R. Wynne died at an advanced age, she left a will and two codicils, which were admitted to probate. The will was dated October 2, 1959. It recited that she was a widow; that she and her husband had never had children, and that her sole heirs were four nieces, who lived outside of California, and one nephew, Richard Ryan Reed of Los Angeles. She bequeathed the sum of $25,000 to the Trinity Episcopal Church at Santa Barbara, $10,000 to the Kern County Chapter of The National Foundation, and $10,000 to the Kern County Heart Association, besides bequests to one of her physicians, Dr. A. E. Currier, and to her attorney, Bennett Siemon of Bakersfield. Her nephew, Richard Ryan Reed, was named as the residuary legatee of the balance of her estate and she nominated Mr. Siemon as executor.
 In a codicil, dated September 27, 1961, Mrs. Wynne reduced the bequests to the Trinity Episcopal Church to the sum of $20,000. On the 30th day of March 1962, Mrs. Wynne executed another codicil in which she revoked all three previous bequests to charitable institutions as mentioned above, bequeathed to her current physician, Dr. Robert C. Seibly of *371 Bakersfield, the sum of $10,000, and ratified and confirmed all of the other provisions of her will.
 The sole question determined by the court, acting without a jury, was whether or not Mrs. Wynne had testamentary capacity at the time of executing the codicil of March 30, 1962. Under date of May 3, 1963, the Kern County Heart Association, The National Foundation, and the Trinity Episcopal Church at Santa Barbara filed a petition for the revocation of the last codicil to the will, reciting that Mrs. Wynne died on the 23d day of November 1962, in Kern County, that the will and the two codicils had been admitted to probate, and that letters testamentary were issued to Bennett Siemon, the qualified and acting executor of the estate. The petition further stated that each of the petitioners was a nonprofit corporation authorized to do business in the State of California, and that each of them was an interested person within the meaning of section 380 of the Probate Code. It was then said that "probate of the codicil dated the 30th day of March, 1962, should be revoked ...," and "that the decedent at the time of the alleged execution of said Codicil was not of sound and disposing mind." After the completion of the hearing in the matter, the court found that it is true that at the time of executing the codicil the decedent was of sound and disposing mind, and concluded that at that time Mrs. Wynne was mentally competent to make the codicil and that it is "... a valid codicil to her will and that probate thereof should not be revoked."
 Upon analysis, it appears that the underlying question to be determined on appeal is whether or not the trial judge was conclusively forced to accept the hypothetical opinion of a medical specialist, Dr. George N. Thompson of Los Angeles, who was called to the stand by the contestants, as against the evidence of the two subscribing witnesses, decedent's local doctor and acquaintances of many years standing. Dr. Thompson stood alone in the record in his opinion that Mrs. Wynne could not have been in a mental condition to execute legally the codicil of March 30, 1962. [1a] We are of the opinion that there is no principle of law which would compel the trial judge to reject the testimony of the subscribing witnesses, and Mrs. Wynne's local doctor, and acquaintances, and to accept at its full face value the opinion of a specialist who never saw the decedent, and whose testimony was given in response to a hypothetical question. An interesting comment on the type of evidence given by Dr. Thompson is made *372 in the Estate of Dolbeer, 149 Cal. 227, at page 243 [86 P. 695, 9 Ann.Cas. 795]: "The witnesses were skilled alienists, it may be conceded, but the evidence thus adduced of one who has never seen the person and who bases his opinion upon the facts given in a hypothetical question is evidence the weakest and most unsatisfactory. Such questions themselves are always framed with great particularity to meet the views of the side which presents the expert. They always eliminate from consideration the countervailing evidence which may be of a thousand-fold more strength than the evidence upon which the question is based. They are astutely drawn, and drawn for a purpose, and that purpose never is the presentation of all the evidence. It is never to present the fair and accurate view, but the purpose always is to frame a question such that the answer will announce a predetermined result. This kind of expert testimony, given under such circumstances, even the testimony of able and disinterested witnesses, as no doubt these were, is in the eye of the law of steadily decreasing value." It should be remembered that subdivision 10 of section 1870 of the Code of Civil Procedure specifically provides that evidence may be given by persons in both of the following specific classifications: "The opinion of a subscribing witness to a writing, the validity of which is in dispute, respecting the mental sanity of the signer; and the opinion of an intimate acquaintance respecting the mental sanity of a person, the reason for the opinion being given." It is not a legal rule that the hypothetical opinion of an alienist takes precedence over the opinions of subscribing witnesses to a will or the opinions of intimate acquaintances.
 The province of a reviewing court in a will contest is, of course, the same as in other civil cases--that is, if it finds that there is substantial evidence to support the trial court's findings, it must affirm (Estate of Morgan, 225 Cal.App.2d 156, 167 [37 Cal.Rptr. 160]; Estate of Bristol, 23 Cal.2d 221, 223 [143 P.2d 689]). In reviewing the findings, it is our duty to accept all evidence which is favorable to the respondent, and if the evidence so viewed is sufficient as a matter of law, the judgment must be affirmed (Estate of Teel, 25 Cal.2d 520, 527 [154 P.2d 384]). Obviously, whether the testatrix was of sound and disposing mind and memory at the time of executing the codicil was the basic question to be determined; if she had sufficient mental capacity to understand the nature of the act she was doing, the nature and condition of her *373 property and her relation with the persons who had claims upon her bounty and who would be affected by the provisions of the instrument, she would be legally competent to make an effective codicil (Estate of Lingenfelter, 38 Cal.2d 571, 582 [241 P.2d 990]; Estate of Fritschi, 60 Cal.2d 367, 372 [33 Cal.Rptr. 264, 384 P.2d 656]).
 [2] It is clear that a testator is presumed to be sane, and the burden of proof, to the contrary, is always upon the contestant. (Estate of Fritschi, supra, 60 Cal.2d 367, 372). As a matter of fact, this presumption is itself indirect evidence (Estate of Wright, 7 Cal.2d 348, 350 [60 P.2d 434]). [3] As is said in the Estate of Arnold, 16 Cal.2d 573, 585-586 [107 P.2d 25]: "It is well settled that mere proof of mental derangement or even of insanity in a medical sense is not sufficient to invalidate a will, but the contestant is required to go further and prove either such a complete mental degeneration as denotes utter incapacity to know and understand those things which the law prescribes as essential to the making of a will, or the existence of a specific insane delusion which affected the making of the will in question. (Estate of Shay, 196 Cal. 355, 359 [237 P. 1079]; Estate of Russell, 189 Cal. 759, 769 [210 P. 249].)"
 " 'In considering the evidence it is important, preliminarily to observe that it is not every form of insanity, not every mental departure from the normal, which destroys an otherwise valid testamentary act. The rule of law is not that no person who is insane may make a valid will, but that the will of no person who, by reason of insanity, is incapable of making valid testamentary disposition shall be upheld.' (Estate of Chevallier, 159 Cal. 161, 168 [113 P. 130].)"
 [4] The fact that Bennett Siemon had been appointed guardian of the estate of Mrs. Wynne during her lifetime did not require a finding of testamentary incapacity, or even shift the burden of proof from the contestants. (Estate of Nelson, 227 Cal.App.2d 42, 54 [38 Cal.Rptr. 459]; Estate of Jamison, 41 Cal.2d 1, 13 [256 P.2d 984]; Estate of Powers, 81 Cal.App.2d 480, 483 [184 P.2d 319]).
 [5] Hallucinations or delusions are not in themselves determinative of mental incapacity unless they operate directly on the testamentary act. (Estate of Lingenfelter, supra, 38 Cal.2d 571, 581.) In other words, the evidence must establish that the will itself was a product of the delusion in order to warrant a setting aside of a will. (Estate of Perkins, *374 195 Cal. 699, 704 [235 P. 45]; Estate of Collins, 174 Cal. 663, 670 [164 P. 1110].) [6] Old age or forgetfulness, eccentricities or mental feebleness or confusion at various times of a party making a will are not enough in themselves to warrant a holding that the testator lacked testamentary capacity. (Estate of Sanderson, 171 Cal.App.2d 651, 660 [341 P.2d 358]; Estate of Lingenfelter, supra, 38 Cal.2d 571, 581.)
 The trial court filed a memorandum of decision and, while it does not take the place of the findings of fact and conclusions of law, it does cast light upon the mental processes of the judge in reaching his conclusions. The learned trial judge said in this memorandum of opinion: "The sole issue to be decided in this matter is whether or not the decedent Jane R. Wynne was legally competent to make a Will on March 30, 1962, when she executed the codicil to her last Will and Testament which has been challenged by the contestants. In order to resolve this issue I have carefully considered the testimony of all of the witnesses who testified, and notwithstanding the emphatic opinion of Dr. Thompson to the contrary, I am persuaded by the evidence to believe that the decedent was legally competent to make this codicil. In other words, in my judgment, she was capable of understanding the nature and consequences of the codicil, the nature, situation and extent of her property at that time and her relationship to the persons who had a claim on her property and whose interests would be affected thereby. In fact, I believe that she clearly understood her relationship to her nephew, Richard Ryan Reed, who will benefit the most by the codicil and who apparently treated her with consideration and kindness during the last few years of her life."
 "The decedent was, of course, suffering to some extent at least from arteriosclerosis when she made the codicil in question, and had been hallucinating for sometime prior thereto. It is a well-established medical fact, however, that although a person's mind may not function properly in some areas, it is possible for the same person's mind to function properly and even efficiently in other areas. In other words, there are many degrees of mental instability, and the fact that a person is unable to perform a certain mental function does not necessarily mean that the mental capacity of that person has been destroyed as to all other functions of the mind. Consequently, although I believe that the decedent was at times the victim of hallucinations before she made and executed the codicil in question, I also believe from all of the evidence that *375 her mind was functioning properly with respect to her ability to make a Will and that her hallucinations had no bearing on her ultimate decision to make the codicil of March 30, 1962. In fact, with one notable exception, her hallucinations were mainly of the variety commonly present with elderly people and sometimes referred to as the complaints of the aged."
 The judge continues by stating that he believed the testimony of Bennett Siemon, the executor of the estate and one of the attesting witnesses, confirming the mental capacity of the decedent at the time she executed the codicil.
 The attack made by the appellants upon the findings and judgment is not couched in explicit language to the effect that the trial court was bound as a matter of law to follow the opinion of Dr. Thompson, notwithstanding the contrary testimony of a number of other witnesses. [7] The attack upon the judgment is somewhat indirect and it has two aspects, (one) it is claimed that the trial judge in his memorandum purported to take judicial notice of what ailments affect elderly people when he said, "In fact, with one notable exception, her hallucinations were mainly of the variety commonly present with elderly people and sometimes referred to as the complaints of the aged," and, (two) it is said that the medical testimony of Dr. Thompson was not opposed by any evidence on the other side.
 We do not believe that the trial judge purported to take judicial notice of the scientific aspects of any specific ailment of the aged. Every finder of fact, in forming his conclusions, necessarily takes into consideration his background of experience in life. This is true of jurors and it is true of a court functioning as a finder of fact. There is no doubt that it is a matter of common observation and experience that there are mental and physical drawbacks and ailments common to many old people. These are a part of the experience of the human race, and the trial judge was not purporting to take specific judicial notice of any scientific fact, or disease, but only referring generally to human observation. It is interesting to note wording on this subject contained in the opinion in the case of Estate of MacCrellish, 167 Cal. 711, 715, 717-718 [141 P. 257, L.R.A. 1915A 443], in which a judgment revoking the probate of a will was reversed on appeal. The evidence of contestant included statements that testatrix was 82 years of age; that she lacked a good memory, was forgetful, claimed that there was a man trying to get into her room *376 at night; that messages were being slipped under her door and she feared being robbed; she would appear dazed from time to time. The Supreme Court said: "From an examination of all of this evidence we are convinced that the court should not have allowed the issue of unsoundness of mind to go to the jury. The presumption of sanity exists in favor of a testatrix and upon the contestant rests the burden of proving unsoundness of mind. (Estate of Dolbeer, 149 Cal. 230 [86 P. 695, 9 Ann.Cas. 795].) This burden has not been sustained by the contestants. The most that can be said of the testimony of Dr. Peterson and Mr. Wooley, giving it, as we must, the interpretation most favorable to contestants (Estate of Arnold, 147 Cal. 583 [82 P. 252]) is that Mrs. MacCrellish was suffering from some of the infirmities of old age and that she was afflicted with certain hallucinations having no relation to the objects of her bounty."
 "It has long been the rule in this state that proof of such imaginings which do not indicate an impairment of the normal testamentary capacity is not sufficient to overthrow a solemnly executed instrument such as the one we are now considering. (Estate of Kendrick, 130 Cal. 364 [62 P. 605].)"
 In Estate of Selb, 84 Cal.App.2d 46 [190 P.2d 277], there is a long review of similar cases with similar results. Even an advanced state of arteriosclerosis or the presence of old age "with its accompanying disabilities" does not necessarily prove mental incapacity to make a testamentary disposition. (Estate of Teed, 112 Cal.App.2d 638, 642-645 [247 P.2d 54].)
 There was a conflict between the opinion of Dr. Thompson and Dr. Seibly as to whether Mrs. Wynne had ever suffered any mental disorder of a general and continuous nature until the last three or three and one-half months of her life.
 The problem as to the time element is well formulated in Estate of Fosselman, 48 Cal.2d 179, 186 [308 P.2d 336]: if, as Dr. Thompson concluded, Mrs. Wynne before her death in November 1962 was suffering from senile dementia then the court's comment in that case is apt: " 'Senile dementia begins gradually, is progressive in character and in its advanced stages "the brain is well-nigh stripped of its functions." The difficulty lies in determining the point at which in its progress it has so impaired the faculties that they fall below the mark of legal capacity. ...' (Byrne v. Fulkerson, supra, 254 Mo. [97] at 121 [162 S.W. 171]; see Page on Wills, Lifetime ed., vol. 1, p. 284, 138.)" (Italics added.) *377
 The trial court's determination that Mrs. Wynne was mentally competent at the time she executed the codicil was fully supported by substantial evidence.
 [1b] The second contention made by appellant, namely, that the Thompson testimony was not controverted cannot prevail over the evidence of the local doctor, who was intimately familiar with her condition from a medical standpoint and that of the attesting witnesses and the old acquaintances of the decedent who were capable of forming a sound opinion of her capacity at the time she executed the questioned codicil.
 The judgment is affirmed.
 Brown (R.M.), J., concurred.
 Stone, J., deeming himself disqualified, did not participate.