[Civ. No. 582.    Fifth Dist.    Oct. 21, 1966.]

L. E. WILLIAMS et al., Plaintiffs and Appellants, v. HELEN C. RANKIN et al., Defendants and Respondents; JOSEPH ROSENBERG et al., Interveners and Appellants.

Baker, Palmer &· Wall and Stephen E. Wall for Plaintiffs and Appellants.

Burris & Lagerlof and Stanley C. Lagerlof for Interveners and Appellants.

Mack, Bianco & Means, Henry C. Mack and Dominic Bianco for Defendants and Respondents.

CONLEY, P. J.—This case involves the riparian rights of all landowners on Walker Basin Creek, located in the Tehachapi Mountain area, some 30 miles southeast of Bakersfield. The creek has its source, at least as a flowing surface stream with easily decipherable bed and banks, some 500 yards northeasterly of the point where it leaves Walker Basin. Walker Basin was formed by the upthrust along Breckinridge Fault, which is on the westerly side of the basin. The basin itself contains alluvium, consisting of gravel, sands, and clays, which are surrounded by granitic-textured and metamorphic rocks of the Southern Sierra Nevada batholith. In geologic time, the Breckinridge Fault constituted a dam which induced the filling up of the basin with detritus from the mountains to the east, northeast, and southeast. In somewhat later periods, the creek cut across the Breckinridge Fault, and it has since acted as an outlet tending toward the draining of the basin. This formation, overlying impervious rock with an alluvium topping of considerable depth, constitutes a catchment area, containing, in normal times, a more or less considerable, but indefinite, quantity of water. The general slope of the basin is toward the fault in conformity with the line taken by the stream.

The court, after analyzing the multiform geological evidence, was of the opinion that there are two roughly connected subsurface catchment areas in the basin; although on the surface they appear to be unitized, the one to the west is the primary source of Walker Basin Creek and the one to the east is largely independent of the westerly area, as is shown by the fact that pumping from a well on the land to the east apparently has no effect on the water table in the westerly portion of the basin.

The ranches involved in the litigation from upstream down to the end of the flow are:

1) The Rankin Ranch, owned by the defendants and respondents, Helen C. Rankin and her three children;

2) The Pagliuso Ranch of plaintiffs and appellants;

3) The Tollhouse or Douglas Ranch, on which L. E. Williams and Edna C. Williams have a trust deed, all being plaintiffs and appellants herein;

4) The Bena Ranch of intervenors and appellants, Joseph Rosenberg, Samuel J. Young, Frank Winer and Samuel A. Wolfson.

The record reflects that the flowing stream does not pass below the Bena Ranch, but that there are other owners

of property overlying the Walker Basin though their lands are not riparian to Walker Basin Creek. There is a drop in elevation of 2300 feet between the most easterly or highest and the most westerly or lowest of the listed ranches.

The original complaint alleged that the Rankins, upstream from the lands of the plaintiffs, had recently constructed a dam where Walker Basin Creek leaves section 21, township 29 south, range 32 east, M. D. B. & M., at a point commonly known as the Narrows, and that by so obstructing the stream, the Rankins had interfered with the water rights of the defendants causing multiple damage to their riparian lands; the prayer sought the removal of the dam. Shortly afterwards, the owners of the Bena Ranch filed a complaint in intervention also aimed at the elimination of the dam constructed by the Rankins. Later, both the plaintiffs and intervenors filed amended pleadings by which they not only sought the removal of the dam but also asked for a determination of their respective riparian rights. As the case unfolded to the point of judgment, the existence of the dam became of so little relative importance that no point is made concerning it on the appeal. The trial court determined that the dam and the consequent minimal ponding of water on the Rankin Ranch to permit legitimate pumping by them was reasonable and not a violation of the rights of the other parties. The appeal deals wholly with the determination by the court of the respective usufructuary rights of the parties, as riparian owners, in the stream flow.

The decision as to the subject matter, is further narrowed by the determination of the court that there is no need for restrictive measures for, or against, any of the riparian owners during eight months of the year, that is to say, from October 1 to May 31 of the following year. During that entire period, there is an ample flow in Walker Basin Creek to meet completely the reasonable needs of all riparian owners. Furthermore, the issues, as presented, did not deal with a division of the flow of the stream except in the critical period, and there was no necessity of deciding matters not covered by the evidence. (48 Cal.Jur.2d, Trial, § 290, p. 292; *Hudson* v. *West*, 47 Cal.2d 823, 831 [306 P.2d 807].)

Thus, the essential judgment of the court specifically relates only to the months of June, July, August and September when, by reason of the heat and the lack of rainfall, the stream is at its lowest point of run-off. The basic grounds of the appeal by both the plaintiffs and intervenors, in the rather short briefs filed by each, are:

1) That the court did not correctly ascertain the water rights of the appellants, and

2) That the court did not conceive, and incorporate in the judgment, proper provision for the physical solution of the problem.

We have concluded, however, that the trial court exercised extraordinary penetration of the complex technical testimony, and that the judgment is a legal and sensible adjudication of the intricate water problems involved in the litigation. In the process of reaching a decision, the court first ascertained the riparian ownership of lands by the several parties, which, in the case of the plaintiffs and the intervenors, was very much less in quantity than the allegations of their pleadings indicated. Before 1928, this investigation in itself would have furnished ground for the division of the ascertainment of the relative usufructuary rights of the parties. But by the constitutional amendment of 1928 (Cal. Const., art. XIV, § 3), the People of this state insisted that California has an important interest in the use of the natural waters of our Pacific slope and gave directions to our courts, in cases of this kind, to consider the use made at any given time of our natural waters to the end that there shall be as great utilization, and as little waste, as possible. With these purposes in view, the trial court next inquired in detail as to the uses made of the water of the creek by the various owners of riparian lands.

The third gross step taken by the court was to devise an order implementing a physical solution of the problem during the only months where there was a conflict of demands by the riparian owners, and the solution was incorporated in the findings and judgment. In addition to all of these factors, the court properly kept in mind that changes might well be required in the course of time, either because the original judgment and means of regulation, through trial and error, prove to be incomplete or erroneous, or because of a change of circumstances in the ownership of the land or in the use of the flow of the stream; and in view of this factor the court properly retained jurisdiction of the case, with the right in the future to make realistic adjustments.

It seems to us that the trial judge exhibited marked acumen and industry in this difficult work, and that his memorandum of opinion shows a clear sense of duty and the hard thinking necessary to fulfill it.

With comparative brevity, we shall review the course taken by the court below in reaching its decision.

*The Court First Ascertained the Riparian Lands
of the Several Parties.*

In determining which lands of the parties are riparian, the court properly considered the three elements necessary to create such a status:

1) The land must be contiguous to, or abut on, the stream;

2) The riparian right only extends to the smallest tract held under one title, in the chain of title; and

3) The land must be in the watershed of the stream. (*Hudson* v. *West, supra,* 47 Cal.2d 823, 829; *Rancho Santa Margarita* v. *Vail,* 11 Cal.2d 501, 528-529 [81 P.2d 533].)

Applying this standard, the court determined that the various parties possessed the several areas of riparian land hereafter specified. By close attention to the record of testimony and maps received as exhibits and finally by a personal inspection of the territory pursuant to the agreement of the parties, the court determined those lands which are riparian to the stream, and also, with respect to the Rankin Ranch, those lands which overlie the percolating waters in Walker Basin. There seems to be no exception by any party as to these findings. In fact, the record shows that most of these conclusions were the subject of stipulation or concession during the trial.

The Rankin Ranch, owned for many years by that family, consists of 31,000 acres said to be valued at over a million dollars. The trial court found that 3134 acres of the Rankin property, particularly described in finding XV, are riparian to the creek, and that 600 acres, particularly described in finding XVI, overlie Walker Basin and its percolating waters.

Next, downstream from the Rankin property, is the ranch of Robert J. Pagliuso and Elinore Pagliuso. Their pleadings allege that 1600 acres of their land are riparian to the creek, but the court found that their riparian lands consisted only of section 30, township 29 south, range 32 east, M. D. B. & M., and the east 1739 feet of the southeast quarter of section 25, township 29 south, range 31 east, M. D. B. & M.; the area of these two parcels of land according to the testimony of James Macnair is 661.68 acres.

Below their land is the Douglas property, owned by William M. Douglas and Alice R. Douglas, on which the plaintiffs and appellants, L. E. Williams and Edna C. Williams, have a major lien by trust deed. The amended complaint alleges that 14,500 acres are riparian, but the court reduced the total to 3080 acres.

The amended complaint in intervention describes approxi-

mately 2000 acres of the Bena Ranch as riparian, but the court found that the riparian area is only 1100 acres.

*The Reasonable Uses of Riparian Waters by the Several Parties Were Carefully Ascertained by the Court.*

What constitutes a reasonable use of riparian water is primarily a question of fact to be determined by the trial court. (*Prather* v. *Hoberg,* 24 Cal.2d 549, 562 [150 P.2d 405] ; *Deetz* v. *Carter,* 232 Cal.App.2d 851, 856 [43 Cal.Rptr. 321].)

The testimony showed that the homestead house on the Rankin Ranch was built about 60 years ago by Walker Rankin, Sr., one of the predecessors of the present Rankin family. He also built at one time a lower concrete dam of a diversion type at the Narrows; there were also constructed from time to time temporary earthen dams to divert water from the creek to ditches in the field, which, however, have not been utilized for some time.

The riparian lands of the Rankins are in two categories. At a later point in this opinion, the detailed findings of the court on this subject are set forth and we shall not repeat them here.

Continuing a brief survey of other evidence, concerning the irrigation practices of the Rankins, it should be noted that before the pump in section 15, township 29 south, range 32 east, M. D. B. & M., was installed in the year 1947, they flood irrigated from the creek by open ditch about 45 or 50 acres of alfalfa. And preceding the present dam at the Narrows, they irrigated most of section 15 and parts of sections 21 and 22, township 29 south, range 32 east, M. D. B. & M. Section 15 contains a big alfalfa field, the whole of which was taken care of by a pump drawing water from the well in that section, the water being stored temporarily in a surface reservoir. This water then ran through concrete pipes and ditches to open ditches for flood irrigation. Another alfalfa field in that area, called by the Rankins the Isle of Man field, was also irrigated by flooding through a branch pipe, and the portion designated as the Middle Meadow has been irrigated by flooding for many years. In Horse Meadow there are several dams and headgates, together with ditches used to flood irrigate that area consisting of about 175 to 200 acres of meadow. Leroy Rankin planted alfalfa in section 21 several years ago, and this portion has been irrigated by open ditches. In 1963-1964, about 70 acres in section 21 and 28, township 29 south, range 32 east, M. D. B. & M., were prepared for planting alfalfa, and approximately 20 acres were planted and thereafter irrigated. There is another

unplanted area in section 15 known as the Walker Field, consisting of about 60 acres, that could be easily sprinkler irrigated from the pump.

The Rankins have now installed sprinklers for irrigating the alfalfa fields and it was estimated by one of their witnesses that by using the pump they can irrigate the acreage prepared for alfalfa, as shown in green and yellow on defendants' exhibit I, containing approximately 56.6 acres, and, also, by operating the pump around the clock and rotating the fields, they can irrigate the big alfalfa field and the Isle of Man field. The meadows on their property, being the Middle Meadow and Lower Meadow, which are now irrigable, are still being irrigated from the creek.

The pump in section 15, on the Rankin property, produces about 660 gallons per minute.

The dam in section 21, concerning which appellants complained in their pleadings, created a pond from which pumping could be carried on. It is about 120 feet long with a 40-foot spillway, 11 or 12 feet high and with a ponding effect of approximately 7/10ths of an acre. As aptly characterized by the witness Scheliga, the function of the dam is to back up water for irrigation, and it is not a storage dam. The diminishing effect on the creek's flow is not caused by the existence of the dam itself but by the reasonable use of the water for irrigation. Two pumps were installed by the Rankins to draw water from the pond. A five-horsepower pump is used for domestic yard irrigation and to fill watering troughs for horses and cattle; it is also inter-connected with lines leading from a spring in section 17. The first use of this pump was in June 1964. The son of Walker Rankin, Sr., Walker Rankin, who is now 81 years of age, testified that the spring in section 17, township 29 south, range 32 east, M. D. B. & M., has supplied the ranch house for from 40 to 60 years.

The record shows that the Pagliuso Ranch is almost wholly devoted to stock grazing. Of the 661.68 acres of riparian land approximately five acres were being irrigated, as shown by the testimony at the trial, and the remaining potential farm lands were 16.66 acres in area, making a total of 21.28 acres not devoted to grazing; of this total there was one area of 2.25 acres classified as too steep for irrigation. The acreage used for grazing will support no more than 50 animal units. The court estimated the necessary water for the purpose of watering such stock at 10 gallons per day per animal unit, or a total of 500 gallons. As a matter of fact, the evidence is that the Pag-

liusos have actually taken care of an average of only 20 to 25 head of cattle for the past five years. These appellants concede in their opening brief that they have no objection to the allowance by the court of 500 gallons per day for stock-watering purposes, 1000 gallons per day during one-third of the time in the months of June, July, August and September for domestic purposes and 50-acre-feet per year for irrigation as determined by finding VI. It is conceded that the Pagliusos can irrigate 20 acres of permanent pasture or alfalfa from the stream, and that the court correctly found that the quantity of water required for irrigation purposes on the Pagliuso land suitable for farming is 2½-acre-feet per acre each year.

However, the court did find that the plant of the Pagliusos for operating an electric generator for power from June to and including September is wasteful and not warranted.

The Williams-Douglas Ranch is used only for stock grazing purposes. The court determined that these lands are suitable for grazing and could support 250 animal units a year. It is conceded by appellants in their brief that the owners "need and can put to beneficial use riparian waters from Walker Basin Creek for stock watering in the amount of 2,500 gallons per day" and that "plaintiffs Williams and Douglas can use such water for stock watering purposes only." The record shows that there is a spring in section 36, township 29 south, range 31 east, M. D. B. & M., on the Douglas land besides several other springs, and that the owners have developed a well on the upper end of the ranch.

As already noted, the Bena Ranch is at the very end of the flow of Walker Basin Creek. The history of the land shows that in 1946 the then current owners put in an irrigating system with a dam at the point where the creek enters their land; this structure was about 12 feet high. Connected with the accumulated pond behind the dam was a 24-inch pipeline which ran three miles to the mesa area with a spur pipe, leading to a sump. By a 60 to 70 horsepower motor, the water was then pumped up the 150 feet to the mesa where it was temporarily held in a reservoir. By means of this system, the owners on one occasion irrigated about 75 acres of potatoes followed by the planting of alfalfa. The lower area, near the end of the irrigation line, at that time was sown to alfalfa and was flood irrigated.

After the original planting of the potato land, the area on the mesa was used for from six to seven years solely for the production of alfalfa; then irrigation was abandoned and the

owners of the land went into the cattle business. They used the Bena Ranch for wintering weaners and for early winter feed and winter grazing. Cattle were moved onto the land each year in the month of November and were taken away in April of the following year. The owners planted and irrigated potatoes one year but carried on no irrigation in any year after May 15. They planted alfalfa and irrigated it as long as they had water, then, they could not irrigate again until the month of October. During this time, they raised alfalfa below the mesa for three or four years, but they had no water for even the lower land during June, July, August and September. As many as 2800 cattle were fed there the last year before a sale was made to the present owners. They kept no cattle at the Bena Ranch during the months of May, June, July, August, September or October, except a few stragglers at odd times.

Intervenors' witness Juan Arachi testified that he had leased the Bena Ranch for the most recent three years for winter cattle grazing, but that some of the land is now planted to barley by another party. He could winter graze, he said, about 300 head on the Bena Ranch riparian land from December to the first of June with the cattle watering at the creek and reservoir. However, he never grazes after June, because "cattle never any good after June. I move out. . . ." He has not seen any irrigation done on the ranch during the last three years, it being dry farmed. Water stops coming in the creek about June 1 and the flow resumes in November. There is a well on the ranch, but he has never seen it used.

The witness, Raymond Castanchoa, herded sheep around the Bena Ranch many years ago; he is a farmer whose home is in the McFarland area of Kern County. Presently, he leases a part of the Bena Ranch and he is now cleaning up the pipeline and dam, but he has done no work at the sump as the pipeline was blocked with moss and other materials. He is presently growing grain on a dry farming basis, but he would like to irrigate some of the land with any water which might be available. Potatoes, he testified, have to be preirrigated, but grain which is planted in December or the early part of January does not; the preirrigation of potatoes should take place in December or the first part of January and they mature in from 120 to 140 days. To get a successful crop, they need water until about the 15th day of June to the extent of eight to nine gallons per minute per acre. Mr. Castanchoa said that the irrigation system on the Bena Ranch has not been used for 10 or 12 years. In his experience, all water from the creek

stops in June and starts again in October or November; although he would like to plant potatoes, there is no water this year and it is not likely that anyone would plant potatoes unless he could be certain of water for irrigation in the early part of June. He testified in part as follows:

"Q. Well, do you think that you could store enough water there in the winter months like December, January, February to carry you through the potato crop?

"A. Well, depend how many acres you put in. I believe there's quite a bit of storage there for 40 to 60 acres.

"Q. Well, now, before you go to plant those potatoes you are going to make sure of the water supply, aren't you?

"A. That's right.

"Q. And you haven't had no research made yet as to how much water you could store there?

"A. No, no.

"Q. And you are not going to depend on water coming down there in the summer months to irrigate your potatoes?

"A. Summer months is out for the potatoes."

He further testified:

"Q. To sum it up, then, Mr. Castanchoa, this land—and considering the water conditions—would be suitable for farming if you farmed it to winter crops that you could get off right around the middle of May?

"A. That's right, before June."

The court did not award any water to the Bena Ranch in the critical months for the following good and sufficient reasons as stated in its memorandum of opinion: "Starting at the lower end of the stream, the intervenors because of climatic conditions are in a position to perform agricultural operations during the time of year when it is impossible at the higher levels and are unable to perform agricultural functions during the main growing period in the upper levels as the supply of available water becomes nil under normal conditions during the month of June. It is quite obvious, therefore, that the intervenors use and need the water during the time that it is not used to an appreciable degree or needed in a great quantity by upper owners, and the only period of the year in which there is any conflict at all of use occurs the first two weeks of June. This conflict during the first two weeks in the month of June is more illusionary than true, as the type of agriculture most suitable to the intervenors' properties are limited to winter, or at the most, early spring crops. The only two crops suggested as reasonable during the evidence were grain and

potatoes. All grain crops would have finished all irrigations necessary to bring to harvest prior to the time there is a conflict in use, and the only crop under normal circumstances where there would be any conflict at all would be the last irrigation on potatoes. The history of the farming operations by intervenors and their predecessors indicates that only in one year were potatoes raised which apparently was one of the exceedingly high water years when there was no shortage but a super abundance of water during the entire summer. The court is persuaded by the testimony of Mr. Castanchoa that no reasonable farmer would risk an investment of approximately $200.00 per acre at planting for potatoes unless the weather conditions at least up until that time indicated a repetition of the very high water years of 1951, 1952 and 1953 running between 142% and 183% of average on this creek. It follows, therefore, that a reasonable use of the water for any other purpose than grain on intervenors' farming operation would only occur during those years when there is no allocation problem. The court must conclude that the intervenors have no reasonable claims or demands on water during the months of June, July, August and September, critical to the riparian owners above, and by the same token should have the unfettered right to use any or all of the water arriving at their premises during the balance of the year for farming and stock water.'' ▇ Land is riparian at times only when it is reached by the stream. (*Duckworth* v. *Watsonville Water & Light Co.*, 150 Cal. 520 [89 P. 338]; *Gutierrez* v. *Wege*, 145 Cal. 730 [79 P. 449]; *Miller & Lux* v. *Enterprise Canal & Land Co.*, 169 Cal. 415, 441 [147 P. 567]; 51 Cal.Jur.2d, Waters, § 84, p. 549.)

*The Trial Court's Physical Solution of the Problem Of Distribution Was Reasonable.*

Based on the oral testimony, the exhibits, and a view by the trial judge of the area (*Kraemer* v. *Superior Oil Co.*, 240 Cal.App.2d 642, 648 [49 Cal.Rptr. 869]), the physical solution adopted by him was apparently complete and reasonable (Cal.Const., art. XIV, § 3). ▇ The court held that, during the months of June, July, August and September, the Rankins were entitled to apportionment from the stream at the Narrows of 9/14ths of the available water, the Pagliusos 2/14ths of such water, and Douglas-Williams interests 3/14ths of the water. The Rankins' share of the use of the stream in those months was in part for the watering of 450 animal units above the Narrows; the Pagliusos for stock watering and

irrigation purposes; and the Douglas-Williams interest for the watering of animals.

The court did not restrict itself to a gross division as above set forth with respect to the Rankins as to whom several applicable principles were invoked. Among the findings of fact, the court stated the following:

## XVIII

"The riparian lands of Rankin are of two categories; those portions lying westerly and southerly of the narrows (the narrows as referred to in these findings are located at the southwesterly corner of Walker's Basin and in the southerly part of Section 21, Township 29 South, Range 32 East, M. D. B. & M., Kern County) have been used exclusively for grazing of cattle; those portions lying easterly and northerly of the narrows have been used for a combination of grazing and farming; the farming has consisted of both dry farming for grain, irrigated farming for alfalfa and permanent pasture, and the maintenance of subirrigated meadow lands; the subirrigated meadow lands consist of approximately 100 acres; the dry farming grain lands consist of approximately 180 acres; and the irrigated lands as used in the past are of two further categories; (1) those irrigated by pumping percolating waters in Section 15 and part of Section 22, of Township 29 South, Range 32 East, M. D. B. & M., and consisting of approximately 85.9 acres, and (2) those irrigated by diversion of surface or riparian waters from Walker Basin Creek, consisting of approximately 45 acres in Section 21, Township 29 South, Range 32 East, M. D. B. & M. There is also available for classification of semifarming semigrazing the so-called dry or upper meadow, consisting of 143½ acres in Section 15, Township 29 South, Range 32 East, M. D. B. & M.

## XIX

"The riparian lands of Rankin below the Narrows have a carrying capacity of 100 animal units per year and reasonably requiring and can put to beneficial use 1,000 gallons of water per day from said creek for stock watering purposes. The riparian lands of Rankin above the Narrows and within Section 15, 21 and 22, of Township 29 South, Range 32 East, M. D. B. & M., have a carrying capacity resulting from dry farming, grazing, irrigation and subirrigated farming of 450 animal units per year, of which 200 animal units are supported by lands which have both riparian and percolating characteristics; the quantity of water reasonably necessary and which can be put

to beneficial use for the watering of such animals is 4,500 gallons of water per day.

## XX

"On that portion of the Rankin lands lying easterly and northerly of the narrows and which has both riparian and percolating characteristics, Rankins have 200 acres irrigated by both surface and subirrigation methods; an additional 150 acres potentially available for irrigation which is riparian and a further additional 60 acres available for irrigated farming which is dual riparian and percolating, the greater portion of which overlies the upper basin portion of Walker's Basin as herein found."

In connection with the allocation of the right to the use of the waters as among the riparian owners, the court took into consideration the evaporation and transpiration losses between the dam and the properties of the respective plaintiffs below the Narrows. Some suggestion is made in the briefs of appellants that the use of the waters should have been assigned at the points where they were diverted by the parties at their properties. However, it is clear, both in theory and experience, that normally a mathematical division of the use of waters of a stream among riparian proprietors should be made at a fixed point rather than at several points along the creek. It is also good technique to divide the use of riparian waters by the employment of percentages of the stream flow at a given point rather than by the specification of an exact quantity of water expressed in second feet or miner's inches. ■ Appellants also contend that they should have been allowed more water by compelling the Rankins to drill a well or wells to feed the stream. The trial judge apparently gave considerable thought to these contentions and thus discussed them in his memorandum of opinion: "It is also quite obvious that Walker Basin Creek, being a conduit of open nature and heavily lined with tree, brush and plant growth which have roots directly in the water, as willows, alders and trees of similar type, suffers a tremendous transpiration loss. The conclusion is inescapable that this creek as a conduit for transportation of water where the transpiration loss is so tremendous during the hot months, cannot be considered anything but an uneconomic conduit. On the other hand the cost of other means of transportation would, in the opinion of the court, be so prohibitive as to be unreasonable. Comparing the adjusted figures of the Rankin measurement and the Pagliuso measurements, and the variation between day and night, as indicated on the Pagliuso

measurements, the minimum transpiration occurring during the night and the maximum during the day, it appears that in an approximate 1½ miles there is a transpiration loss of approximately 50 gallons per minute. With the propensity of the temperature to rise to some degree with loss of elevation it is reasonable that the transpiration loss would increase as the stream flows downhill. In the opinion of the court it would be unreasonable to attempt to allocate the waters to these respective riparian owners without in some manner considering transpiration losses. For this reason the court is compelled to reject the straight percentage of allocations of waters as the court has no figures upon which accurate transpiration losses can be computed. The alternative suggestion of increasing the horsepowerage of the existing well in Section 15 or perhaps drilling a new well and augmenting the surface flow of Walker Basin Creek as it rises and flows through Sections 15, 22 and 21 in the basin would be equally unreasonable, as the transpiration losses of approximately 1½ mile flow through the basin would make such conduit of transportation unreasonable, and for the additional reason that in the opinion of the court it puts excessive drains on the upper basin as heretofore found for the benefit of the lower riparian owners without any correlating benefits, not only to the Rankins, but to other owners not parties to this suit who overlie the upper basin. Although the law apparently is that property which is both riparian to a creek and overlies percolating waters that are source waters for that stream must be correlated together, I do not read the law to create riparian rights in lands which are not riparian. In other words, where the same land is both riparian to a flowing stream and overlying percolating waters feeding the stream, the owner may be obligated within reason to make use of both sources of supply, and owners of land which are nonriparian but overlie percolating waters which feed streams are obligated to reasonably correlate their uses with riparian owners. But I do not read the law that riparian owners are obligated to supply riparian waters to lands which are not riparian nor do I read the law that owners of lands which are overlying percolating waters and which are not riparian are obligated to convert their water into riparian water. The correlative rights and obligations are simply, in my judgment, the requirement that percolating lands use waters reasonably taking into consideration such use and effect upon riparian rights but still being obligated to use them on the surface of the percolating lands, and riparian owners being obligated to com-

bine percolating waters underlying riparian lands in a correlative use transporting neither water, however, away from the type of property to which the right attaches.''

The trial court rejected the physical solutions proposed by the appellants, taking the position that it would not be right in the circumstances of the case to order the Rankins to sink an additional well above the dam and to use it to pump percolating waters into the stream. A reasonable solution of the intricate problems involved in a case of this kind does not presuppose any ''cut and dried'' formula for handling the situation presented by the record.

Each set of facts in this type of litigation must be carefully sifted and appraised by the judge, and if he reaches a solution which is reasonable and equitable it does not lie in the mouth of a party to seek reversal of the judgment merely because such party thinks his physical solution might be preferable to that of the judge. The trial court in these circumstances seemed to be clearly within its rights in holding as above set forth; where there is an area involving riparian rights on a stream and a closely allied area where there are percolating waters which, at least in part, may add to the flow of the stream, it is a sound conclusion that all lands which lie above the percolating waters have at least a concomitant right to share in the reasonable use of such waters, and in the state of the present record, without the participation of all, it would constitute an injury to such persons to require any one of them to pump such waters for use of riparian owners on the stream itself a considerable distance from the percolating water basin. ▮ Furthermore, the use of underground basins simply to support the surface flow of a stream cannot be said to be required as a matter of law applicable to every suit. It is a factual question to be determined in each case. (51 Cal.Jur.2d, Waters, § 165, pp. 625-626.) (See *Burr* v. *Maclay Rancho Water Co.*, 160 Cal. 268 [116 P. 715]; *Hudson* v. *Dailey*, 156 Cal. 617 [105 P. 748]; 51 Cal.Jur.2d, Waters, § 402, pp. 872-873.)

The trial court's considered view of the evidence in the instant litigation is incorporated in its physical solution of the problem, and it is our opinion that the case as a whole, including this issue, was well tried and not improperly decided.

▮ The appellants at more than one point in their briefs have used the concept of title to the waters of the stream as a riparian incident rather than the accurate concept of reasonable usufructuary right. The language suitable to outright

ownership is not proper, although some of the cases in the books do employ this forbidden terminology. No riparian proprietor owns water in a stream. Riparian owners have only the concomitant right to the reasonable use of the water. (*Duckworth* v. *Watsonville Water & Light Co., supra,* 150 Cal. 520, 525; *Fredericksen* v. *Harney,* 199 Cal.App.2d 189, 196 [18 Cal.Rptr. 562]; *Rancho Santa Margarita* v. *Vail, supra,* 11 Cal.2d 501, 554-555; *Gould* v. *Eaton,* 117 Cal. 539, 542-543 [49 P. 577, 38 A.L.R. 181].)

*The Court Properly Retained Jurisdiction of the Case In*
*Order to Adjust Any Differences Which May Develop*
*In the Future Use of the Waters of the Creek.*

█ Having reached a physical solution of the problem which appears to be sound under present facts, the court, oriented toward the future, retained jurisdiction over the case, so that if it should appear that what now seems to be the proper physical solution should not prove to be fully applicable to future conditions, changes can be ordered, upon the initiation of proper procedure by any party having riparian lands on the stream. It is obvious that there will be owners of riparian land who may legitimately wish to change, or increase, their reasonable use of the waters of the creek during the critical months, or that a wet or dry cycle may occur in the course of time, or that any one of innumerable factors could affect future disposition of the use of the water. In view of the policy of the state to conserve the waters of our natural streams and to use them to their full potentiality, this provision is wise and just and, in most similar cases, essential. See *City of Pasadena* v. *City of Alhambra,* 33 Cal.2d 908, 937 [207 P.2d 17]; *Meridian, Ltd.* v. *City & County of San Francisco,* 13 Cal.2d 424 [90 P.2d 537, 91 P.2d 105]; *City of Lodi* v. *East Bay Mun. Utility Dist.,* 7 Cal.2d 316, 344 [60 P.2d 439].)

In our opinion the trial court gave complete consideration to the situation and made a proper division of the use of the stream among the present riparian owners. There is substantial evidence to support the findings and the findings, in turn, substantiate and justify the judgment. (*Estate of Wynne,* 239 Cal.App.2d 369, 372 [48 Cal.Rptr. 656]; *Kraemer* v. *Superior Oil Co., supra,* 240 Cal.App.2d 642, 646.)

The judgment is affirmed.

McMurray, J. pro tem.,* concurred.

---

*Assigned by the Chairman of the Judicial Council.