[Civ. No. 5518. Fourth Dist. Dec. 5, 1956.]

Estate of FRED E. BURLEW, Deceased. EVERTS P. BURLEW et al., Appellants, v. CORA J. BEAR et al., Respondents.

Richmond & Bradley, Arthur M. Bradley and Robert S. Barnes for Appellants.

Beardsley, Hufstedler & Kemble, Harry L. Hupp and John W. Shores for Respondents.

MUSSELL, J.—Fred E. Burlew died on January 29, 1954, and his holographic will, dated January 12 of that year, was admitted to probate in Orange County on February 19, 1954. The testator, in his will, gave Cora J. Bear $13,000 and an automobile. He gave $5,000 to Mrs. Doris Kent and directed that the balance of his estate be divided into five equal parts, two of which he gave to Cora J. Bear and the remaining three parts to Nancy Ann Borio. On July 20, 1954, a contest of this will was filed by relatives of the testator and his deceased wife, who had been named as devisees in a will executed by Burlew on January 27, 1943.

The contestants claimed (1) That the decedent was not of sound and disposing mind and by reason of mental and

physical sickness was not capable of making a will; (2) That said will was signed by the testator under duress on the part of Cora J. Bear; and (3) That the will was procured by the undue influence of Cora J. Bear.

At the trial, the contestants abandoned the issue of unsoundness of mind of the testator and after they had presented their evidence to the court and to a jury, a motion for nonsuit was made by respondents. The trial court granted this motion and entered a judgment of nonsuit, following which the contestants filed this appeal.

Appellants do not argue that the will was signed under duress. The sole issue for our determination is whether the evidence was sufficient on the issue of undue influence to authorize the court to grant the nonsuit.

Fred E. Burlew, who, for many years, had been a practicing attorney, was approximately 90 years of age at the time of his death. His wife, Myrta Preston Burlew, died in 1947, and there were no children the issue of the marriage. In 1950 Burlew was diabetic and was taken to a hospital. After leaving it, he employed Cora J. Bear to act as housekeeper and practical nurse for him and she acted as such from that time until Burlew's death on January 29, 1954.

Mrs. Bear, who was called as a witness by the contestants under section 2055 of the Code of Civil Procedure, testified that she had previously worked for Dr. Jesse Burlew, a brother of the decedent, and was paid $175 per month for her services. However, when she was employed by the decedent, he told her he would not pay her more than $125 per month and she agreed to take care of him until "he got up and around"; that in the fall of 1951 she told Burlew that she could not work for $125 a month, that nurses were getting $1.00 an hour; that Burlew then agreed to pay her $150 per month and she stayed on; that in the summer of 1951, Burlew made a will leaving her the sum of $3,000; that she saw a previous will on the dining room table in their home and read the provisions therein relating to a division of the decedent's property; that in the summer of 1952, Burlew told her that he had made a will leaving her $10,000; that she told Burlew that that would take care of her services as long as he had her stay with him. In the spring of 1953 Mrs. Bear was offered a job by a Mrs. Wheeler and when she discussed the matter with Burlew, he showed her his then current will in which she was to get a life estate in a house at Corona del Mar in which they were then residing. She stated that she cried and expressed her

disappointment because she thought she would be unable to pay the taxes and keep up the property; that Burlew stated that if she was not happy about the house, he would take it out of his will, but that she should let him know if she changed her mind and he would "put her back in"; that she had no further conversations with Burlew concerning his will until after he had executed the will here involved; that in January, 1954, a few days prior to the 12th, she and Burlew took a trip to Los Angeles; that when Burlew was about to enter a bank at Fifth and Spring Streets, he suffered a heart attack; that she gave him nitroglycerin and made him rest while she got the car and that she took him immediately to Corona del Mar; that she did not notify a niece of Burlew's predeceased wife, who worked in a bank a block away, and did not call a doctor; that the following day she went to Santa Ana to make preparation for a trip to Palm Springs and when she got back in the afternoon Burlew showed her the will in question; that she was present when he died at about 6 p. m. on January 29th; that he "went to the bathroom and as he came through the room I saw there was something wrong and he sat down and he was just gone in about a half a minute."

Nancy Ann Borio was 15 years of age at the time of the trial. She testified that Burlew did not talk to her at any time about leaving her something in his will; that Mrs. Bear told her at about the time of Burlew's death that the little house would be left to her after her death and that Mrs. Bear was always nice and invited her down to Corona del Mar. There is no evidence in the record that Miss Borio knew that she was a beneficiary under the will in question prior to its execution or that Mrs. Bear ever talked to the decedent on her behalf.

Doris Kent, a next door neighbor of Burlew in Glendale, testified that shortly before Burlew hired Mrs. Bear that she (Mrs. Kent) found him in a diabetic coma and summoned aid; that Burlew and Mrs. Kent and her family were friendly and that they visited back and forth. Mrs. Bear and Burlew visited Mrs. Kent in Glendale a few days before Burlew's last will was executed, but there is no evidence that Mrs. Kent ever discussed the subject of Burlew's will with him or that she knew she was to be a beneficiary, and there is no evidence that Mrs. Bear and Burlew ever discussed the terms of the will involved.

Dr. Charles Young, an orthopedic surgeon, testified that for a time he lived near Burlew in Glendale and often visited with

him; that he observed Burlew in May, 1953, and that he then showed symptoms of senility; that he had a conversation with Mrs. Bear after Burlew's death in which Mrs. Bear asked if he, Dr. Young, thought that Burlew was of unsound mind and that he told her Burlew was not insane at the time he saw him; that Mrs. Bear said, ''Do you know that he was a stubborn devil? He wanted me to take the house down there, but I told him I wanted cash for my pay. You know he left his estate to Nancy Borio and myself and a much larger estate than I had any idea he had. You know Mr. Burlew settled with his relatives at the time of Mrs. Burlew's death.''

Mrs. Lulu Cross testified that she was a fellow employee of Mrs. Bear in the home of Dr. Jesse Burlew; that she had a conversation with Mrs. Bear shortly after Fred Burlew was brought home from the hospital; that Mrs. Bear said to her, ''Well, I talked to Mr. Burlew. I asked him if he couldn't give me more and if he couldn't give me more now, maybe he could fix it and compensate me for it after he was through with what he had and he told me 'Oh, no, I can't do that because I have everything fixed' ''; that after Burlew's death Mrs. Bear came over to her home and asked her if she would perjure herself for money and stated that she had been informed that she, Mrs. Cross, would do something for money; that Mrs. Bear said she had asked the question because the Burlews were contesting the will and she wondered if they had gotten in touch with her (Lulu Cross).

Peggy Grant Rapson, one of the contestants, testified that she visited Burlew many times; that Burlew was practicing law at the time; that she never got to see Burlew alone, that Mrs. Bear would not leave the room, and that she and her husband had very little opportunity to talk to Burlew alone; that in 1952, when Burlew was living in Glendale, she tried many times to 'phone him but could get no answer; that in March of 1954, Mrs. Bear made the statement ''It was just wonderful that Mr. Burlew remembered her''; that Mrs. Bear further stated that she had told Burlew ''He couldn't die and not do the right thing.''

Mrs. Cora Burlew testified that when Burlew was living in Glendale, Mrs. Bear told her that she had seen his will on the dining room table and had read it and that she was mad because she ''figured that what he left me in the will was just bare wages.''

Mrs. Wooley, a neighbor of Burlew at Corona del Mar,

testified that in January, 1954, she had a conversation with Mrs. Bear in which Mrs. Bear said that Burlew told her that he was going to make it all right with her; that after the death of Burlew, Mrs. Bear told her that Burlew had left her shares and that it was well worth waiting for; that she had another conversation with Mrs. Bear in which Mrs. Bear said that she (Mrs. Wooley) would not have to say anything in court and that all she had to do was to tell the court that she did not remember.

Appellants contend that the foregoing evidence would amply support the finding of undue influence. We are not in accord with this contention.

In *Estate of Welch,* 43 Cal.2d 173, 175 [272 P.2d 512], the court stated the rules to be applied in determining whether a will was a product of undue influence, as follows:

"In *Estate of Arnold,* 16 Cal.2d 573, at page 577 [107 P. 2d 25], the rules governing the determination of whether a testamentary instrument is the product of undue influence are stated as follows: 'In an action to set aside a will of a deceased person on the ground of undue influence, it is necessary to show that the influence was such as, in effect, to destroy the testator's free agency and substitute for his own another person's will. (*Estate of Motz,* 136 Cal. 558, 583 [69 P. 294].)

Evidence must be produced that pressure was brought to bear directly upon the testamentary act. (*In re McDevitt,* 95 Cal. 17, 33 [30 P. 101].) Mere general influence, however strong and controlling, not brought to bear upon the testamentary act, is not enough; it must be influence used directly to procure the will and must amount to coercion destroying free agency on the part of the testator. (*Estate of Keegen,* 139 Cal. 123, 127 [72 P. 828].) ... mere opportunity to influence the mind of the testator, even coupled with an interest or a motive to do so, is not sufficient. (*Estate of Easton,* 140 Cal.App. 367, 371 [35 P.2d 614].)

" ' "The unbroken rule in this state is that courts must refuse to set aside the solemnly executed will of a deceased person upon the ground of undue influence unless there be proof of 'a pressure which overpowered the mind and bore down the volition of the testator at the very time the will was made.' " ' " (Citations.) See also *Estate of Keeney,* 140 Cal.App.2d 688 [295 P.2d 479, 297 P.2d 636].

In *Estate of Pellegrini,* 138 Cal.App.2d 143, 145 [291 P.2d 558], the exception to the general rule is stated as follows:

" 'However, there is a well-established exception. to this settled general rule, upon which respondents rely, to the effect that where one who unduly profits by the will as a beneficiary thereunder sustains a confidential relation to the testator, and has actually participated in procuring the execution of the will, the burden is on him to show that the testamentary document was not induced by coercion or fraud. When proof of the existence of a confidential relationship between the testator and such a beneficiary [one who unduly profits by the will], coupled with activity on the part of the latter in the preparation of the will, is offered, a presumption of undue influence arises therefrom.' (Citations.) 'The rule is firmly established in California that when the contestant has shown that the proponent of a will sustains a confidential relationship toward the testator, and actively participates in procuring the execution of the will, and unduly profits thereby, the burden then shifts to the proponent to prove that the will was not induced by his undue influence.' " (Citations.)

In *Estate of Bould,* 135 Cal.App.2d 260, 274 [287 P.2d 8, 289 P.2d 15], it is held:

"The mere existence of a confidential relationship coupled with opportunity to impose the beneficiary's will upon the testatrix is not enough to shift the burden of proof. 'As suggested in *Estate of Higgins,* 156 Cal. 257 [104 P. 6], a "presumption of undue influence" arises from proof of the existence of a confidential relation between the testator and such a beneficiary, "*coupled with activity on the part of the latter in the preparation of the will.*" The confidential relation alone is not sufficient. There must be activity on the part of the beneficiary in the matter of the preparation of the will.' "

In the instant case there is no substantial evidence from which it can be inferred that Cora J. Bear was active in the preparation of the will involved. The only evidence as to the execution of the will was furnished by the testimony of Mrs. Bear in which she stated that a few days following a trip to Los Angeles with Burlew, she took the car from Corona del Mar to Santa Ana to have it serviced and upon her return, Burlew showed her the holographic will in question. There is no evidence that she discussed the terms of this will with Burlew or that she suggested any of its provisions. The evidence is that she did not know when it was prepared and was unaware of its existence until Burlew showed it to her after it had been fully executed. While her testimony

could have been disbelieved, there was no other evidence to believe, and as is said in *Hutchinson* v. *Contractors' State etc. Board*, 143 Cal.App.2d 628, 632-633 [300 P.2d 216]:

"But the rejection of testimony does not create evidence contrary to that which is deemed untrustworthy. 'Disbelief does not create affirmative evidence to the contrary of that which is discarded. ''The fact that a jury may disbelieve the testimony of a witness who testifies to the negative of an issue does not of itself furnish any evidence in support of the affirmative of that issue, and does not warrant a finding in the affirmative thereof unless there is other evidence in the case to support such affirmative.'' (*Marovich* v. *Central Calif. Traction Co.*, 191 Cal. 295, 304 [216 P. 595].) To this same effect are *Edwards* v. *Freeman*, 34 Cal.2d 589, 593 [212 P.2d 883]; *Moore* v. *Chesapeake & Ohio Ry. Co.*, 340 U.S. 573, 576 [71 S.Ct. 428, 95 L.Ed. 547]; *Bunt* v. *Sierra Butte Gold Min. Co.*, 138 U.S. 483, 485 [11 S.Ct. 464, 34 L.Ed. 1031]. . . . The fact that one testifies falsely may, and usually does, afford an inference that he or she is concealing the truth but it does not reveal the truth itself or warrant an inference that the truth is the direct converse of the rejected testimony.' (*Estate of Bould*, 135 Cal.App.2d 260, 264-265 [287 P.2d 8, 289 P.2d 15].)''

There was evidence that Burlew had confidence in Mrs. Bear as to her performance of her duties as housekeeper and nurse but it does not appear that he entrusted her with his business affairs. In one instance she received $500 from him for services in connection with the sale of real estate but it does not appear that she conducted the negotiations or the sale. If we assume that there was a confidential relationship, such relationship was not accompanied by active participation in the preparation of decedent's will. (*Estate of Bould, supra*, 135 Cal.App.2d 260, 275.)

 The statements made by Mrs. Bear to Dr. Young, Mrs. Rapson and Mrs. Wooly do not show active participation in procuring the execution of the will involved within the rules stated in *Estate of Bould, supra*, and as is said in *Estate of Welch, supra*, 43 Cal.2d 173, 178:

"It is not sufficient for a contestant merely to prove circumstances consistent with the exercise of undue influence; but before the will can be overthrown the circumstances must be inconsistent with voluntary action on the part of the testator.''

It further appears from the record that Doris Kent and Nancy Ann Borio, devisees in the will involved, had nothing to do with its preparation or execution and there is no evidence that Mrs. Bear used undue influence on their behalf.

The judgment is affirmed.

Barnard. P. J., and Griffin, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied January 30, 1957. Shenk, J., and Carter, J., were of the opinion that the petition should be granted.