[Sac. No. 7293. In Bank. Aug. 27, 1963.]

Estate of ULRICH A. FRITSCHI, Deceased. JAMES PHILIP FRITSCHI et al., Minors, etc., Plaintiffs and Respondents, v. MARIE SYLVERA TEED, Defendant and Appellant.

McAllister & Johnson and Neil R. McAllister, Jr., for Defendant and Appellant.

Morton L. Friedman for Plaintiffs and Respondents.

TOBRINER, J.—This case turns solely upon the issue of whether substantial evidence supports the findings of the jury that the involved will was invalid because the testator lacked testamentary capacity to execute it and because one Marie Teed exerted undue influence upon him. For the reasons that follow we have concluded that, without doubt, the record does not sustain a finding of lack of testamentary capacity. Although the question of the adequacy of the showing as to undue influence is more difficult, our examination of the record compels the conclusion that the record does not sustain the findings.

Dr. Ulrich A. Fritschi, the decedent, a successful ophthalmologist practicing in Sacramento, married Rose Marie Fritschi in 1934. Two sons were born of this marriage; at the date of Dr. Fritschi's death they were aged 12 and 14 years. In 1953 Marie Teed undertook employment as Dr. Fritschi's receptionist; in the latter part of 1955 she and the doctor engaged in intimate relations. Mrs. Teed subsequently divorced her husband; Mrs. Fritschi in April of 1958 secured an interlocutory decree of divorce. The doctor and his wife entered into a full property settlement, together with provisions for alimony and child support; Dr. Fritschi planned to marry Marie Teed after the divorce decree became final; he named her as the residuary legatee in his will.

On February 1, 1959, Dr. Fritschi entered the hospital with

an ailment that was ultimately diagnosed as cancer of the stomach with massive involvement of the liver. This illness caused his death the following April 5th. During the course of his confinement at the hospital the doctor's physical condition rapidly deteriorated. Some testimony indicates that because of the illness and the induction of drugs Dr. Fritschi sustained emotional changes. During this period of hospitalization Marie Teed spent a great deal of time with the doctor, and, having become his bookkeeper, to a degree took over his business affairs.

The doctor executed the contested will on March 31, 1959. In this will he changed the provisions of a prior will of February 12, 1959, which related to the treatment of the proceeds of a policy of life insurance in the sum of $100,000. Under the terms of both wills the proceeds were to go to the doctor's two children. The later will provided, however, that, in place of direct distribution of the funds to the children, trusts be established for them. Further, the will provided for satisfaction of all estate taxes solely from the policy proceeds, rather than by means of a proration provision under the earlier will. Although the final tax burden remained unclear at the time of trial, Marie Teed, the residuary legatee, would have benefited in excess of $10,000 if the residue were to have been held free of its pro rata share of estate taxes.

Mrs. Fritschi contested this will on behalf of the two children, claiming that the doctor lacked testamentary capacity at the time of execution and that the will constituted a product of the undue influence of Marie Teed. The jury rendered a special verdict in favor of plaintiffs on both these issues. Accordingly, the court entered judgment denying probate to the March 31st will. Marie Teed, contending that the verdict lacked the support of substantial evidence, appealed from the judgment. In considering these contentions we shall first discuss the finding of lack of capacity and then turn to the finding of undue influence.

We see no purpose in summarizing in detail the testimony adduced by plaintiffs. Some of it simply sets out the physical weakness of a man afflicted with a fatal illness. Other testimony describes minor irrational displays of Dr. Fritschi and certain personality quirks. In particular, plaintiffs stress the testimony of Dr. Schroeder, one of the decedent's attending physicians. Dr. Fritschi first consulted Dr. Schroeder for treatment in September of 1958. At that time the decedent, deeply worried about one of his children,

exhibited a fixed conviction that this child should be removed from his existing environmental situation and transferred to another area under a close disciplinary type of schooling. Dr. Schroeder stated that a "disturbed" attitude toward his children continued through Dr. Fritschi's hospitalization; indeed, Dr. Schroeder stated that he was concerned that Dr. Fritschi did not spontaneously evince a desire to see his children. Dr. Schroeder concluded that "at least in this small phase of his dealings with his children I think it was very difficult for him to see right and wrong, good and bad, and all that sort of thing." Such testimony, however, does not reach the requisite showing of an insane delusion operating directly on the testamentary act. (*Estate of Perkins* (1925) 195 Cal. 699 [235 P. 45].)

The real impact of plaintiffs' arguments rests upon the assertion of Dr. Fritschi's drug-induced incompetence. Plaintiffs attempted to show that this lack of capacity resulted either from large sustained doses of drugs or administration of drugs on the morning of the execution of the will. Plaintiffs offered no testimony to prove that the drugs would or could cause lasting incompetence as opposed to a temporary reaction. When counsel for plaintiffs asked Dr. Schroeder as to the effect of dosage of certain tranquilizers over a period of time the doctor indicated only that "they do relieve you of some of the taxing effects of responsibilities," and concluded, "I don't know much about these drugs, but they certainly can make a difference in the emotional response to people, of people to their situations." Revealingly, plaintiffs asked none of the doctors whom they called as witnesses for an opinion of Dr. Fritschi's competency.

Plaintiffs sought to indicate through the testimony of Dr. Young the effect of drugs administered the morning of the 31st. Plaintiffs presented the decedent's hospital record to Dr. Young and interrogated him as to the possible effect of the drugs given in a period of a few hours prior to the signing of the will. Dr. Young testified that the dosage of one particular drug, butisol, "would *tend* to make the individual more sleepy or groggy than the usual sedative dose. It would *tend* to go over in the local hypnotic range of medication." The effect of this drug on a person's mental abilities "*would depend on the individual,* but it would be more dosage given, the more it would tend to cloud his thinking and make him groggy. Somewhat like being drunk or toward that tendency." The combined effect of this drug and two other

drugs likewise administered would affect a person's judgment in that they would *"tend* to decrease their ability to think clearly." (Emphasis added.)

On the other hand, Dr. Young, during cross-examination, indicated that tolerance is a factor in dosage and that the dosage would increase as the recipient's tolerance increased. Dr. Schroeder testified that the drugs did not always work the desired effects with decedent; that "some worked some days and some wouldn't."

Both witnesses to the will expressed the opinion that Dr. Fritschi was of a sound and disposing mind at the time he signed it. One witness testified that the doctor sat on the edge of his bed and joked about the "grand opening" the next day, referring to an exploratory operation. The decedent's attorney described how he read the entire will aloud while decedent followed on a separate copy and expressed assent after each paragraph. A friend and business associate of the doctor's who visited him immediately after the signing of the will and talked with him for 20 to 25 minutes testified that Dr. Fritschi "talked sense."

The testimony fails to establish that the decedent lacked sufficient mental capacity to be able to understand the nature of his acts. We have stated that the determinants of testamentary capacity are whether the individual "has sufficient mental capacity to be able to understand the nature of the act he is doing, and to understand and recollect the nature and situation of his property and to remember, and understand his relations to, the persons who have claims upon his bounty and whose interests are affected by the provisions of the instrument." (*Estate of Smith* (1926) 200 Cal. 152, 158 [252 P. 325].) The relevant time in determining such capacity is the time of execution of the will. (*Estate of Lingenfelter* (1952) 38 Cal.2d 571, 580 [241 P.2d 990].) The testator is presumed sane and competent and the burden rests on the contestant to overcome this presumption. (*Estate of Lingenfelter, supra.*) Plaintiffs' evidence relating to the decedent's condition at the time of execution of the will amounted at most to speculation as to possible effects of drugs. Such evidence, particularly in the light of the uncontradicted testimony of those present at the execution of the will, does not attain sufficient force to overcome the presumption of sanity.

 Turning to the second basic issue of the case, the

finding of the jury that Marie Teed unduly influenced the testator in the making of his will, we note at the outset that the right to testamentary disposition of one's property is a fundamental one which reaches back to the early common law; "the right to dispose of one's property by will is most solemnly assured by law, and . . . does not depend upon its judicious use." (*In re McDevitt* (1892) 95 Cal. 17, 33 [30 P. 101].) The right has, of course, been restricted by legislative and social controls (*Estate of Burnison* (1949) 33 Cal.2d 638, 640 [204 P.2d 330]; Wolfgang Friedman, Law in a Changing Society, p. 86) as well as by heavy inheritance taxation. Perhaps these limitations upon the area of testamentary disposition have served to sharpen the court's vigilance in protecting the testator's right to be free of interference in the area which remains to him. In any event a legion of decisions strike down attempts of juries to invalidate wills upon the ground of undue influence in order to indulge their own concepts of how testators should have disposed of their properties.[1]

Illustrative expressions of the courts demonstrate the stringency with which they protect the testamentary disposition against the attack of undue influence. Thus such influence must "destroy the testator's free agency and substitute for his own another person's will." (*Estate of Arnold* (1940) 16 Cal.2d 573, 577 [107 P.2d 25].) "Evidence must be produced that pressure was brought to bear directly upon the testamentary act . . . . [The influence] must amount to *coercion* destroying free agency on the part of the testator." (*Estate of Arnold, supra,* at p. 577; *Estate of Welch* (1954) 43 Cal.2d 173, 175 [272 P.2d 512]; *Estate of Lingenfelter, supra* (1952) 38 Cal.2d 571.) "[T]he circumstances must be *inconsistent* with voluntary action on the part of the testator" (*Estate of Welch, supra,* at p. 178); and "[the] mere opportunity to influence

[1] ". . . It does appear, from the cases appealed, that the jury finds for the contestant in over 75 percent of the cases submitted to it. But the fact that juries exhibit consistent unconcern for the wishes of testators should come as no surprise. Indeed, the tendency of juries in this respect is so pronounced that it has been said to be a proper subject of judicial notice."

". . . Few questions are less well suited to the determination of a jury than testamentary capacity and undue influence. This follows, first, from the inherent limitations of laymen in dealing with the problem of mental capacity and second, from the vulnerability of jurors to the emotional overlays which often pervade the trial of a will contest. . . ." (*Will Contests on Trial*, 6 Stan.L.Rev. (1953) 91, 92, 95; Atkinson on Wills (2d ed. 1953) 139, 140.)

the mind of the testator, even coupled with an interest or a motive to do so, is not sufficient'' (*Estate of Welch, supra,* at p. 175).

■ Even though a beneficiary sustains a confidential relationship with the testator, as Mrs. Teed did here, and although the will may be an ''unnatural one,'' as here, we must, to sustain the order of the probate court, find ''evidence that she [Mrs. Teed] was active in procuring the execution of the will'' (*Estate of Shay* (1925) 196 Cal. 355, 363-364 [237 P. 1079]) ; or in similar words ''proof that the one occupying such relationship displayed activity in the preparation of the will to his undue profit. [Citing cases.]'' (*Estate of Presho* (1925) 196 Cal. 639, 651 [238 P. 944] ; *Estate of Garibaldi* (1961) 57 Cal.2d 108, 113 [17 Cal.Rptr. 623, 367 P.2d 39] ; 4 Witkin, Summary of Cal. Law (7th ed. 1960) Wills and Probate, § 81, p. 3070.)

■ The crucial inquiry in the instant case thus turns on whether the evidence sufficiently demonstrates that Marie Teed actively participated in procuring the will. In the absence of such evidence, plaintiffs weld no causal link between the ability to influence the testator arising from the confidential relationship and the unnatural document. Mere general influence is not enough. A contestant must show that the influence was brought directly to bear upon the testamentary act. (*Estate of Welch, supra* (1954) 43 Cal.2d 173, 175; *Estate of Lingenfelter, supra* (1952) 38 Cal.2d 571.)

The record does not disclose that Marie Teed actively participated in procuring the questioned will. Although plaintiffs assert that she was present during the signing of both the February 12th and the March 31st wills, the evidence does not sustain that position. She did attend the execution of the earlier will, but she waited outside the room during the March 31st signing. Plaintiffs state that Marie Teed appeared at all discussions of both wills. Yet Mr. Dwyer, the attorney who drew the will, testified without contradiction that Marie Teed was not present during the discussion in which the change in tax incidence was suggested and concluded.[2] Although the

---

[2]Attorney Dwyer testified that he initially raised the question of tax incidence and described his discussion with Dr. Fritschi concerning this change as follows:

''We then, somewhere along the line I asked him, I pointed out to him that in the will of February the 12th there was provision about the federal estate tax being prorated amongst the bequests so that each devisee or legatee would pay his or her share of the total amount of the

record indicates that Mrs. Teed appeared at some earlier discussions of the February 12th will and at a review of the will of March 31st, immediately prior to the execution, the record does not show that she participated in any discussions on those occasions or, indeed, that she ever or at all discussed the wills with the testator. The most that plaintiffs show as to the execution of the will of the 31st is that Mrs. Teed sought a witness and that her pen may have been used for its signature. But Attorney Dwyer testified, again without contradiction, that Mrs. Teed tried to find the witness at his request.

The cases hold that these incidental activities of Mrs. Teed fail to reach the proportion of a showing of her actual participation in procuring the execution of the will. Previous rulings indicate that similar activities of other beneficiaries who have sustained confidential relations with testators have been held insufficient. Thus in *Estate of Baird* (1917) 176 Cal. 381 [168 P. 561], the court states that the beneficiary "did participate to some slight extent in procuring the execution of the will of November 23, 1909. ... But there was not even any attempt to show any activity whatever on his part in relation to the preparation or execution of the codicil, and the record is absolutely destitute of evidence in this regard. There is nothing in the evidence inconsistent with the idea that the testator executed the codicil without any previous suggestion of such action by anyone, and entirely of his own free will, without influence or coercion of any kind. The burden was on the contestants to show the contrary. . . ." (P. 385.) In an analogous situation, the court in *Estate of Burlew* (1956) 146 Cal.App.2d 642, 648 [304 P.2d 233], held that the beneficiary's conduct did not procure the execution of the will. "There is no evidence that she discussed the terms of

estate tax and did he want that provision in his, in this new will, if a new will was to be executed and he said, 'Well, Bill,' he said, 'The problem is that cash-wise I am almost broke.' He said, 'The expenses here at the hospital are staggering,' and he said, 'Dr. Kohl [his partner] is only bringing in enough money to pay the office overhead and my concern is that about the only cash that will be available for payment of estate taxes will be insurance policies.'

"I said, 'Well, you can provide in your will if you wish to that the estate tax can be paid out of a particular fund.'

"After discussing that some more he told me that he thought that he would like to have his will provide that all of the federal estate taxes be paid out of the $100,000 insurance policy.

"I explained to him that that wouldn't be too much of an increase because under the will of February the 12th the boys were going to have to pay their proportionate share of the federal estate taxes anyway based on their $100,000 bequest."

this will with [the decedent] or that she suggested any of its provisions.''

▆▆▆ The procurement of a person to witness the will or of an attorney to draw it does not itself constitute active participation in the preparation of the will. Thus the court in *Estate of Bould* (1955) 135 Cal.App.2d 260 [287 P.2d 8, 289 P.2d 15], states: ''That activity must be in the preparation of the will. *Estate of Lombardi,* 128 Cal.App.2d 606, 612 [276 P.2d 67], quotes *Estate of Burns,* 26 Cal.App.2d 741 [80 P.2d 77], as follows: ' ''. . . where one who unduly profits by the will as a beneficiary thereunder sustains a confidential relation to the testator, *and has actually participated in procuring the execution of the will,* the burden is on him to show that the will was not induced by coercion or fraud. . . . However, the confidential relation alone is not sufficient. *There must be activity on the part of the beneficiary in the matter of the* preparation of the will.'' ' Some incidental activity in the execution, rather than the preparation of the will, is not enough to swing the burden....'' (P. 275.) (To the same effect: *Estate of Holloway* (1925) 195 Cal. 711 [235 P. 1012]; *Estate of Hull* (1944) 63 Cal.App.2d 135 [146 P.2d 242]; *Estate of Ausseresses* (1960) 178 Cal.App.2d 487 [3 Cal.Rptr. 124].)

▆▆▆ In *Estate of Watkins* (1947) 81 Cal.App.2d 465 [184 P.2d 192], the court held that a charge of undue influence could not be upheld upon the ground that the beneficiary called the attorney to draw the will, was present at its execution, and paid the attorney. In the instant case we encounter far less activity on the part of the beneficiary; indeed, we note that the assertion of plaintiffs that Mr. Dwyer was Mrs. Teed's attorney is refuted by the record.

Plaintiffs place great reliance upon the fact that Mrs. Teed had the opportunity and, indeed, the motivation, to influence Dr. Fritschi; but the cases clearly reject such factors as sufficient in themselves to constitute undue influence. Thus plaintiffs emphasize the great amount of time that Marie Teed spent with Dr. Fritschi during the hospitalization and his susceptibility to influence because of his physical and mental condition. They likewise contend that the evidence indicates that Marie Teed planned to acquire all of the assets of the decedent. They point to the fact that an employee in Dr. Fritschi's office recounted a conversation with Mrs. Teed, before her divorce, in which she indicated dissatisfaction with her husband's income and a desire for greater material

well-being. They rely upon the testimony of Ralph Mortimore, an insurance agent, who described a conversation with Mrs. Teed in January of 1959 at the doctor's office regarding a change in beneficiary of a $25,000 life insurance policy payable to the doctor's estate. They also point to the change of beneficiary of another policy of insurance in the sum of $10,000 and to a number of gifts of the doctor to Marie Teed.

Yet this background of events, this opportunity to influence the testator, and even the design to do so, does not constitute " 'pressure which overpowered the mind and bore down the volition of the testator at the very time the will was made' " (*Estate of Lingenfelter, supra* (1952) 38 Cal.2d 571, 586). The "mere opportunity to influence the mind of the testator, even coupled with an interest or a motive to do so, is not sufficient." (*Estate of Arnold, supra* (1940) 16 Cal.2d 573, 577.) Plaintiffs have failed to show that the alleged ability and desire of Mrs. Teed unduly to influence the decedent were ever brought to bear upon the testamentary act.

The stage may have been set for the overpowering of decedent's volition, and many acts incidental to such a possible purpose may have occurred, but, so far as the record shows, the requisite action of Mrs. Teed never took place. We cannot find Mrs. Teed's actual participation in procuring the will; the record does not sustain a finding that any activities of Mrs. Teed overpowered the will of the testator at the time of the testamentary act. The scattered and incidental ingredients of possible undue influence never galvanized into Mrs. Teed's active participation of procurement of the will. We are constrained to hold that the jury's finding of undue influence cannot be sustained.

The order denying probate is reversed and the trial court instructed to admit the will to probate.

Gibson, C. J., Traynor, J., Schauer, J., McComb, J., and Peters, J., concurred.