[No. A089985. First Dist., Div. Five. Dec. 20, 2000.]

Estate of REGIS SWETMANN, Deceased.
MARGARET CORCORAN, Petitioner and Respondent, v.
GEORGE CUSHING, Objector and Appellant.

Estate of VERA SWETMANN, Deceased.
MARGARET CORCORAN, Petitioner and Respondent, v.
GEORGE CUSHING, Objector and Appellant.

**COUNSEL**

Corey, Luzaich, Manos & Pliska and Dario de Ghetaldi for Objector and Appellant.

Sullivan Law Office, Ruth Downs Sullivan; Mires & Bierce and Lyn C. Bierce for Petitioner and Respondent.

**OPINION**

**RICHMAN, J.**[*]—In this case of first impression, we are called upon to interpret section 21350 of the Probate Code insofar as it restricts transfers to a fiduciary who "transcribes the instrument or causes it to be transcribed." (Subd. (a)(4).) We then apply that interpretation to the will of Regis Swetmann, who left the residue of his estate to George Cushing (Cushing), his conservator (who also had, for many years, a power of attorney), who procured for decedent the company which produced the will, introduced the company representative to him, and as conservator paid for the services, but who had nothing to do with the contents of the will or its physical preparation. We conclude, contrary to the trial court, that those activities do not support the conclusion that Cushing caused the will to be transcribed. We therefore reverse.

FACTS

Regis Swetmann (Regis) and Vera Swetmann (Vera) were husband and wife, who died within two months of each other, on November 2, 1997, and September 6, 1997, respectively. Regis, age 89, had been diagnosed with terminal prostate cancer, and Vera, age 84, had been in the beginning stages of Alzheimer's disease. The couple had no children.

Regis, a deputy district attorney in his working years, met John and Margaret Corcoran in the late 1940's and early 1950's when they, too, worked in the San Francisco District Attorney's Office. The Corcorans remained lifelong friends of the Swetmanns, although they did not see each other often after the Corcorans moved out of San Francisco in the 1970's, first to Walnut Creek and then to Antioch.

John Corcoran testified at trial that at some point Regis told him that when he died he wanted the Corcorans to have certain items of personal property.

---

[*]Judge of the Alameda Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Corcoran also testified that about a month before Regis died, he said he wanted the Corcorans to have a third of the proceeds from the sale of his house. Corcoran encouraged Regis to make a will. As discussed in detail below, the Corcorans initiated the proceedings leading to the issue before us and are the respondents on appeal.[1]

Cushing, age 89 at the time of trial, had been the Swetmanns' next-door neighbor since 1972. In the early to mid-1970's Cushing began doing the Swetmanns' shopping, driving them wherever they needed to go, doing household repairs, maintaining their automobile, and helping them pay their bills. Bernice Grantz, a longtime neighbor of the Swetmanns who had known them over 60 years, and who, while not herself a protagonist in the litigation, understood that she would benefit by more than $100,000 if the Corcorans were to prevail, described Cushing's relationship with the Swetmanns this way: "[He] took them to the doctors, took them to the beauty parlor, he took them shopping, and then he also did all the shopping for them. And they called him day and night. He went there every day. . . . [H]e was there all the time." Vera "call[ed]" on [Cushing] for everything in the middle of the night or whatever."

About 1974, Regis, who was disabled from childhood polio, asked Cushing to handle his finances and gave Cushing a power of attorney. There was no evidence that the power of attorney was ever abused or misused.

In December 1993 Regis broke his hip and became physically unable to manage his own affairs. At his request, in June 1994 Vera and Cushing were appointed Regis's coconservators. The court investigator's 1995 review report found Regis "eminently satisfied" with Cushing's performance as his conservator. So, too, did the 1997 review report, which found that Regis continued to prefer Cushing as his conservator.[2]

Regis wrote a holographic will in 1993. That will left his estate to Vera, with specific bequests to six other beneficiaries, including the Corcorans and

---

[1]Citing *Grappo v. Coventry Financial Corp.* (1991) 235 Cal.App.3d 496 [286 Cal.Rptr. 714] and this court's decision in *Williams v. City of Belvedere* (1999) 72 Cal.App.4th 84 [84 Cal.Rptr.2d 658], the Corcorans assert that we must consider the record in the light most favorable to them, resolve every conflict and accept every presumption and inference in support of the judgment, and affirm all the "[trial] court's factual findings, express or implied." (72 Cal.App.4th at p. 89.) While these are settled principles of appellate review, it must be noted that any objective review of the record reveals that,· notwithstanding the Corcorans' conclusory statement that "there was conflicting evidence as to Cushing's activities," the facts material to the issue before us—those dealing with the physical preparation of the will and other instruments in the Swetmanns' estate plan—are truly undisputed. Moreover, these material facts do not come from Cushing or the Corcorans, but rather the persons involved with the instruments.

[2]Over Cushing's objection, the trial court allowed evidence that in the 1970's Cushing also befriended another neighbor, Helen Brethauer, and served as her conservator from 1978 until

Cushing, but had no provision for an alternate disposition of the residue. Cushing testified that he was unaware of the holographic will at the time it was made and advised Regis many times to make a will. He also advised him to have a living trust.

Cushing testified that in 1997, several months before the Swetmanns died, Regis saw an advertisement in the newspaper for living trusts, and asked Cushing to call on his behalf. The company that had placed the advertisement was American Estate Services, based in Dallas, Texas, with branch offices elsewhere, including one in San Jose. Cushing called and made an appointment with an agent from the San Jose office, Kellie Mittnacht (Mittnacht). Mittnacht came to Cushing's house and met with Cushing for several hours to discuss Cushing's own estate plan and the purchase of an annuity. Afterward, Cushing asked Mittnacht to return to meet with the Swetmanns, informing her that he was the conservator for Regis and handled his finances.

About a week later, on June 25, 1997, Mittnacht again met Cushing at his home, and Cushing then escorted her to the Swetmanns' house, where she met with the Swetmanns to discuss the services offered by American Estate Services. Mittnacht sat with the Swetmanns in the dining room while Cushing remained in the adjoining living room. The Swetmanns decided to employ the company to prepare an estate plan for them, and that day they signed a written agreement to retain American Estate Services. An estate plan sold by American Estate Services included a living trust, a pour-over will, a living will, a durable springing power of attorney, and a durable power of attorney for health care. Regis told Mittnacht he wanted a trust to avoid the problems of probate. The Swetmanns also decided to purchase an annuity for Vera.

Mittnacht took down directly from the Swetmanns the necessary information for the creation of a trust and for the purchase of an annuity, and the Swetmanns signed the information sheet. As noted, Cushing was in the house at the time Mittnacht discussed the estate plan with the Swetmanns, but not in the same room. Mittnacht testified that she never discussed the Swetmanns' testamentary intentions with Cushing, nor did the Swetmanns ever defer to Cushing or indicate they needed to consult with him.

Mittnacht did obtain from Cushing a copy of Regis's 1993 holographic will, which she reviewed with Regis to determine the changes he wanted in

---

her death in 1984, when he was appointed special administrator of her estate. Brethauer executed a holographic will in 1975, leaving her entire estate to Cushing. Brethauer's nephew filed a will contest, asserting lack of capacity and undue influence, and the matter was settled in 1987 with a cash payment to the nephew and distribution of the residue to Cushing.

the beneficiaries. She also received from Cushing information about the Swetmanns' bank accounts and securities holdings, information necessary to know what assets to place in the trust. Mittnacht did not discuss with Cushing which assets were to be transferred to the trust, never discussed with Cushing the contents of the trust documents, and never received any instructions from him as to the contents of the trust or wills. Mittnacht also obtained from Cushing a check in the amount of $1,895, payable from the conservatorship account, to cover the costs of preparing the entire estate plan.

The Swetmanns' annuity application was made to American Investors Life Insurance Company, Inc. The application named Vera as the annuitant, Regis as primary beneficiary, and Cushing as contingent beneficiary. The Swetmanns signed the application and also signed a form authorizing a transfer of funds from their mutual funds. Mittnacht received a check for $20,000 as a deposit, made out by Cushing, again from Regis's conservatorship account.

Mittnacht found Regis to be cantankerous and averse to dealing with his finances; he seemed to want "to get [the process] over with." Mittnacht noted that Regis did not appear in good health, but she had no doubts as to his competence. Regis told Mittnacht Cushing had been a friend for a long time, but he gave no indication that Cushing was making the testamentary decisions for him. Vera was quiet and moved rather slowly, but she seemed to follow the discussions about the estate plan and the annuity. She went along with whatever Regis wanted.

About two weeks after this initial meeting, Michael Burstein, an attorney in Los Angeles who drafted the documents for American Estate Services, telephoned Regis, as was his practice with all clients. Burstein went over all the information provided on the client data sheet, and Regis made some corrections, including the appointment of Cushing as successor trustee. From this telephone contact, Burstein found no indication Regis was subject to undue influence or fraud, and he had no doubts about his competence.[3] As with Mittnacht, Burstein never spoke to Cushing about Regis's testamentary dispositions.

---

[3]In the past several years, mounting criticism has been leveled at the marketing of living trusts by nonlawyers with only cursory oversight by attorneys. Such activities have been characterized as the unauthorized practice of law, and the living trust companies have been called "trust mills." (See, e.g., Elden, *Living Trust Mills—The Scam that Keeps on Taking* (May 1999) Nat. Assn. of Attorneys General: Consumer Protection Rep. 1; Comment, *The Florida Bar v. American Senior Citizens Alliance: Is "Gathering the Necessary Information" the Unlicensed Practice of Law?* (1998) 12 Quinnipiac Prob. L.J. 523.) Such criticism is not germane to the issue before us and we say nothing more about this, save to observe that the sale of an annuity to 84-year-old Vera hardly seems to be exemplary estate planning.

Over the next two months, Mittnacht returned to the Swetmanns' house a few times to obtain additional information that had been requested by Burstein. As with all of her contacts with the Swetmanns, Mittnacht telephoned Cushing in advance to make an appointment with them, doing so because Cushing was the conservator. Each time Mittnacht went first to Cushing's house, and Cushing escorted her to the Swetmanns' house, where he would remain, sitting in the adjoining living room while Mittnacht met with the Swetmanns in the dining room.

On July 31, 1997, Mittnacht delivered the annuity documents to the Swetmanns. Mittnacht explained the interest rates and beneficiaries, and Vera signed the acknowledgement.

On August 29, 1997, Mittnacht returned to the Swetmanns' house to present the final versions of the estate documents and obtain the Swetmanns' signatures. Again she made the appointment with Cushing, and again she was escorted by him. Cushing had arranged with another neighbor to attend the presentation to act as a witness, but he was unavailable, so Cushing asked the neighbor's son, James Cunningham (Cunningham), to attend. Cunningham had never met the Swetmanns.

According to Mittnacht, she spent about 45 minutes to an hour with the Swetmanns going over all the documents, explaining the contents and obtaining the Swetmanns' signatures.[4] Mittnacht and Cunningham sat at the dining room table with the Swetmanns. Mittnacht testified that Cushing sat in the living room, though Cunningham recalled that Cushing sat in a corner of the dining room. Wherever Cushing sat, the evidence was undisputed that Mittnacht never showed the documents to Cushing and the Swetmanns never turned to Cushing for advice. Indeed, Cushing did not speak during the signing. The Swetmanns confirmed each of the documents and made no requests for any changes. After the Swetmanns signed the documents, the documents were signed and witnessed by Mittnacht and Cunningham.

The Swetmanns each signed a revocable living trust agreement, a pour-over will, a living will, a durable springing power of attorney, and a durable power of attorney for health care. Cushing was named as successor trustee and executor of both estates. Under the terms of the trust agreement, the assets of the trust were to go to the surviving spouse, and upon the death of the survivor the assets were to be distributed to five beneficiaries: $5,000 to

---

[4]According to Cunningham, Mittnacht spent only about 15 to 20 minutes and rushed through all the documents. Cunningham also testified that the Swetmanns did not appear healthy and it was hard for him to tell whether they understood what was going on. Nevertheless, as a witness to the various documents, he declared the Swetmanns to be of sound mind.

the Corcorans; $5,000 to Bernice Grantz; $1,000 to Mary O'Conner; $500 to the American Wildlife Foundation; and the residue to Cushing. However, if Cushing were to predecease the Swetmanns, then his share was to be divided equally among the other beneficiaries. Under the terms of the pour-over wills, in the event the trust was not effective, then the estates were nevertheless to be distributed pursuant to the provisions of the trust.

Included with the trust instrument was a declaration of intent by which the Swetmanns transferred their personal property, including their bank accounts, to their trust. At the time the Swetmanns signed their trust agreement the transfer deed to their house had not yet been prepared by American Estate Services. On October 28, 1997, after Vera's death, Mittnacht returned to the Swetmanns' house to obtain Regis's signature on a quitclaim deed to transfer the house to the trust. Regis asked Cushing to sign it, and Cushing did so as attorney in fact for him.

Also after Vera's death the annuity was transferred to Regis as the primary beneficiary and new annuitant/owner. The insurer asked Regis to designate a beneficiary, but he never did so. After Regis died, the annuity was paid to Cushing as the contingent beneficiary.

## PROCEDURAL HISTORY

Cushing was appointed executor of the estate of Regis, and the pour-over will was admitted to probate. In offering the will for probate, Cushing acknowledged that the trust was invalid because Regis, as a conservatee, had no capacity to enter into the trust agreement. John and Margaret Corcoran filed a petition for determination of entitlement to estate distribution, asserting that Cushing was disqualified as a beneficiary under the will and as a beneficiary of the annuity. Cushing objected.

The Corcorans also moved to have Cushing removed as executor, which motion was granted. The court further ordered the annuity proceeds in Cushing's bank account frozen. The public administrator was then appointed executor, and Cushing was ordered to file an accounting. Subsequently, the will of Vera was admitted to probate, and by stipulation of the parties the public administrator was appointed administrator of Vera's estate as well.

Cushing then filed in both probate proceedings a petition to determine ownership, seeking to transfer the Swetmanns' assets to the trust pursuant to

the trust agreement. The Corcorans filed objections.[5] The trial court ordered the issues raised by the Corcorans' petition and by Cushing's petitions consolidated for trial.

On the Corcorans' motion for summary adjudication, the trial court resolved the issues raised by Cushing's petition to transfer the assets to the trust, concluding: (1) that the Swetmanns' trust agreement was void because Regis, being under a conservatorship, had no capacity to enter into the agreement; and (2) that the Swetmanns' assets belonged to the estate of Regis. The court further found that the proceeds of the annuity were assets of the estate of Regis.

Trial was then held on the question raised by the Corcorans' petition: whether Cushing was disqualified as a beneficiary under the will of Regis. Evidence was taken over several days, following which briefs were filed and the matter came on for final argument. After hearing extensive argument, the court took a short recess and returned to the bench, to begin as follows: "This is a very difficult case. It is difficult because . . . [the statute is] a statement of strong public policy against a relationship which, if that relationship cannot be shown by clear and convincing evidence not to involve undue influence, must be found that burden has not been met." The court then found that Cushing was a disqualified donee under "[Probate Code] section 21350, inasmuch as he had . . . a fiduciary relationship, was a conservator, and [he] caused the instruments in question to be transcribed." The court thereafter went on to conclude that Cushing had failed to meet his burden of proving the will was not the product of undue influence.

The trial court orally cited three sets of circumstances in support of its conclusion that Cushing was a disqualified donee, which circumstances were later incorporated into its statement of decision. First, the court found that Cushing was conservator for Regis and held a position of trust: "Decedent was elderly and ill, and he trusted [Cushing]. [Cushing], himself, testified that Decedent was dependent on him. Decedent was isolated in the sense that he was alone; no evil is implied toward [Cushing] in respect to his isolation. There is no evidence that [Cushing] mistreated Decedent."

Second, the court found that "[Cushing] obtained the services of American Estate Services to prepare an estate plan for Decedent. He introduced Kellie Mittnacht, an agent for American Estate Services, to Decedent. Ms. Mittnacht always made arrangements through [Cushing] when she wanted to see Decedent; she would go to [Cushing's] home and [Cushing] would walk her

---

[5]The Corcorans also petitioned for an order determining the validity of Vera's trust and the gift to Cushing under it. However, they eventually dismissed that petition.

over to Decedent's home; and [Cushing] always remained present at Decedent's home during conferences with Ms. Mittnacht. [Cushing] drew a check on Decedent's funds in payment for the will and trust."

Third, the court found that "[Cushing] knew the terms of Decedent's will and trust; and knew that he was named beneficiary of American Investor's Annuity No. 299074. [Cushing] claimed the proceeds of that annuity and deposited the proceeds in his personal bank account, which has been frozen."

At the same time, however, the court also found that there was no "actual fraud, menace, duress, or undue influence" by Cushing and denied the Corcorans' request for attorney fees.

The court entered its order determining entitlement to estate distribution, declaring the devise to Cushing to be invalid and ordering the estate of Regis distributed to the other four named beneficiaries: the Corcorans, Bernice Grantz, Mary O'Conner, and the American Wildlife Foundation. Cushing appealed.[6]

## DISCUSSION

### Introduction

Probate Code[7] section 21350, subdivision (a), provides in pertinent part: "Except as provided in Section 21351, no provision, or provisions, of any instrument shall be valid to make any donative transfer to any of the following: [¶] (1) The person who drafted the instrument. [¶] . . . [¶] (4) Any person who has a fiduciary relationship with the transferor, including, but not limited to, a conservator or trustee, who transcribes the instrument or causes it to be transcribed." Subdivision (a) of section 21350 thus limits donative transfers to certain persons who are in a position to take advantage of the transferor, e.g., the person who drafted the instrument or a person in a fiduciary relationship with the transferor, such as a conservator or trustee, who transcribed the instrument or caused it to be transcribed.

If the donee falls within the category of persons described in section 21350, subdivision (a), then section 21351 establishes a rebuttable presumption of invalidity such that the burden is on the donee to establish by clear and convincing evidence, excluding the donee's own testimony, that the

---

[6]During the pendency of this appeal, John Corcoran died and Margaret Corcoran was substituted as his successor.

[7]All undesignated section references are to the Probate Code.

transfer was not the product of fraud, menace, duress, or undue influence.[8] (See generally *Bank of America v. Angel View Crippled Children's Foundation* (1999) 72 Cal.App.4th 451, 456-457 [85 Cal.Rptr.2d 117]; *Graham v. Lenzi* (1995) 37 Cal.App.4th 248, 255-257 [43 Cal.Rptr.2d 407].)

Under the statutory scheme, upon a donee's failure to rebut the presumption of invalidity the donee is disqualified from receiving the gift, and the transfer will be made as if the disqualified donee had predeceased the transferor. (§§ 21350.5, 21353.) Further, upon a finding that the transfer was the product of fraud, menace, duress, or undue influence, the disqualified donee must pay all attorney fees and costs of the proceeding. (§ 21351, subd. (d).)

### *Transcribes or Causes to Be Transcribed*

The threshold question under the statutory scheme is whether Cushing, the donee, is a person who comes within section 21350, subdivision (a). There is no dispute that Cushing, as conservator, was a fiduciary, indeed one expressly referred to in the statute. The only question is whether Cushing qualifies as a fiduciary "who transcribe[d] the instrument or cause[d] it to be transcribed." (§ 21350, subd. (a)(4).) The trial court concluded that he did. We conclude otherwise.

We begin our analysis with the dictionary definitions of "transcribe": "1a: to make a written copy of[;] b: to make a copy of (dictated or recorded matter) in longhand or esp. on a typewriter[;] . . . d: to write down." (Webster's 3d New Internat. Dict. (1965) p. 2426; see also Black's Law Dict. (7th ed. 1999) p. 1503 ["To make a written or typed copy of (spoken material, esp. testimony)."]; and see *Oakland Paving Co. v. Hilton* (1886) 69 Cal. 479, 493-494 [11 P. 3] [to enter an amendment into a journal is to transcribe it, i.e., to copy the information into the book, to write it out full length].)

There is no evidence Cushing actually transcribed Regis's will. He neither copied it nor reduced it to writing. The transcription was actually done in Texas by employees of American Estate Services pursuant to the instructions given by Burstein.

The parties' dispute focuses on the companion phrase within section 21350: "causes [the instrument] to be transcribed." That phrase obviously

---

[8]Section 21351 actually sets forth several ways in which a donative transfer may be validated: (a) by a showing that the donee is related by blood or marriage to the transferor; (b) by the delivery of a certificate of independent review of the instrument by an independent attorney; (c) by court approval; or (d) by a court determination "upon clear and convincing evidence, excluding the testimony of [the donee], that the transfer was not the product of fraud, menace, duress, or undue influence."

encompasses efforts to have someone else do the transcribing. (See, e.g., *People v. Delhantie* (1912) 163 Cal. 461, 464 [125 P. 1066] [grand jury never caused the stenographer to transcribe the testimony]; *Kanovitz v. Bloodgood* (1972) 26 Cal.App.3d 205, 206 [103 Cal.Rptr. 27] [court reporter reported and caused the record of preliminary hearing to be transcribed]; *Thornton v. Rhoden* (1966) 245 Cal.App.2d 80, 84-85, fn. 5 [53 Cal.Rptr. 706, 23 A.L.R.3d 1152] [deponent and attorney caused defamatory matter to be transcribed in deposition transcript]; *Kovacs v. Mutual Broadcasting System* (1950) 99 Cal.App.2d 56, 58 [221 P.2d 108] [plaintiff suing for plagiarism wrote script and caused it to be transcribed].)

As noted, the trial court found that Cushing called American Estate Services and met with Mittnacht; that he brought Mittnacht to the Swetmanns' house; and that he wrote a check from Regis's funds for the will and trust documents. From these facts the trial court concluded that Cushing caused Regis's will and trust to be transcribed. In support of the trial court's decision, the Corcorans argue that causation was established in that but for Cushing's efforts Regis's trust and will would not have been put into written form, i.e., would not have been transcribed. We are not persuaded that Cushing's activities fall within the meaning of "causes . . . to be transcribed." (§ 21350, subd. (a)(4).)

The concept of causation has been given various meanings in the law, ranging from an indirect, peripheral contribution to an immediate and necessary precedent of an event. (See Black's Law Dict., *supra*, pp. 212-213.) The word "cause" itself does not reveal what activities the Legislature intended to be disqualifying under section 21350, and our interpretation must be guided by the language of the statute in light of the legislative purpose. (See *U.S. v. Fiorillo* (9th Cir. 1999) 186 F.3d 1136, 1147 [interpreting "causes [hazardous waste] to be transported"]; *Hernandez v. Modesto Portuguese Pentecost Assn.* (1995) 40 Cal.App.4th 1274, 1281-1283 [48 Cal.Rptr.2d 229] [interpreting "causes [alcoholic beverages] to be sold"].)

The Legislature's purpose in enacting section 21350 et seq. was to protect elderly or infirm testators. This protective legislation was enacted because the Legislature was "aware that certain individuals are uniquely positioned to procure gifts from elderly persons through fraud, menace, duress or undue influence." (*Graham v. Lenzi, supra,* 37 Cal.App.4th at p. 256, citing Sen. Rules Com., Off. of Sen. Floor Analyses, Analysis of Assem. Bill No. 21 (1993-1994 Reg. Sess.) as amended June 30, 1993, background par. 1.) The statutes seek to prevent fraud and undue influence by persons who actually

participate in the preparation of a will or trust instrument. (*Graham v. Lenzi, supra,* at p. 257.)[9]

When first enacted in 1993, subdivision (a)(1) of section 21350 presumptively invalidated transfers to "an attorney, conservator, or other person having a fiduciary relationship with the transferor, who drafted, transcribed, or caused to be drafted or transcribed, the instrument." (Stats. 1993, ch. 293, § 8, p. 2021.) In 1995 the statute was amended to read as it does now, enumerating separately the person who drafted the instrument (subd. (a)(1)) and a fiduciary who transcribed the instrument or caused it to be transcribed (subd. (a)(4)). (Stats. 1995, ch. 730, § 12.)

Because the Legislature has obviously drawn a distinction between drafting an instrument and transcribing it, we must construe "transcribing" to mean something separate from the acts (typically performed by attorneys) of creating or composing the contents of the document. In our view, transcribing is the act that follows the composition of the document and reduces the creation to its final, written form. Such an act obviously carries with it the opportunity to fraudulently alter the terms of the document to the transcriber's advantage. The transcriber is "uniquely positioned" to undermine the true intention of the testator.

We find it significant to our interpretation that the Legislature has eliminated from the category of persons in subdivision (a) of former section 21350 a person who "caused [the instrument] to be drafted." The "caused to" language now applies only to a fiduciary who causes the instrument to be transcribed. Thus, we cannot interpret the person who causes the instrument to be transcribed as equivalent to the person who causes the document to be drafted. Such an interpretation would undermine the Legislature's 1995 changes, which were apparently intended to ease the limitations on fiduciaries. (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 1466 (1995-1996 Reg. Sess.) as amended July 6, 1995, purpose and coms., pp. 9-10; Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 1466 (1995-1996 Reg. Sess.) as amended July 18, 1995, pp. 2-3.)

In that light, we conclude that a person who causes the document to be transcribed is one who directs the drafted document to be written out in its

---

[9]Part 3.5 of division 11 of the Probate Code, in which section 21350 is found, was the Legislature's response to the acts of a Southern California attorney, James Gunderson, who among other things reportedly drafted wills and trusts for thousands of elderly clients, naming himself as beneficiary. (Assem. Com. on Judiciary, Analysis of Assem. Bill No. 21 (1993-1994 Reg. Sess.) as amended Feb. 4, 1993, background, pp. 1-2; see *Conservatorship of Bryant* (1996) 45 Cal.App.4th 117, 126-128 [52 Cal.Rptr.2d 755] (dis. opn. of Work, Acting P. J.).)

final form and, like the transcriber, is in a position to subvert the true intent of the testator. In accordance with our interpretation of section 21350, we conclude as a matter of law that Cushing's activities did not cause the will or trust to be transcribed.

The evidence on this essential issue is undisputed, and demonstrates that none of Cushing's activities pertained to the physical preparation of the documents. In their brief the Corcorans set forth in bullet-point fashion the sum total of the evidence they claim supports the trial court's finding of a causative effect. The brief reads as follows:

"The evidence shows that Cushing caused the Swetmann trust and Regis's will to be transcribed:

"• He called the trust mill and arranged for preparation of his own trust.

"• He took the agent, Mittnacht, to meet with the Swetmanns for the purpose of creating [an] estate plan, though they had never told him they needed a will.

"• He gave Mittnacht all the Swetmanns' financial information necessary for preparation of the trust and wills.

"• He drew a check on the Swetmanns' funds and delivered it to Mittnacht in payment for the estate plan.

"If Cushing had not performed these acts, the instruments would not have been transcribed."

The Corcorans point to no evidence that Cushing either participated in discussions about the contents of any instrument or participated in the conversion to the written form. Nor could they, as there is none. At most, the evidence indicates that Cushing procured, however indirectly, the attorney who drafted the instruments, that is, he called American Estate Services, arranged for the appointments, escorted the agent to the Swetmanns' house, and paid for the legal services in his capacity as conservator for Regis. While the evidence might—and we emphasize might—arguably support a finding that Cushing caused the instruments to be *drafted*, such a finding cannot be equated with a finding that Cushing caused them to be transcribed. Under the circumstances here, it was Burstein, the attorney-drafter, who caused the instruments to be transcribed. It was not Cushing.

We find support for our conclusion in the case law regarding proof of undue influence. Long before the enactment of section 21350, a judicially

created presumption against the validity of a will arose when (1) the beneficiary was in a confidential relationship with the testator, (2) the provisions of the will were unnatural, and (3) the beneficiary was active in procuring the will. (*Estate of Lingenfelter* (1952) 38 Cal.2d 571, 585 [241 P.2d 990]; *Estate of Graves* (1927) 202 Cal. 258, 262 [259 P. 935]; *Estate of Mann* (1986) 184 Cal.App.3d 593, 606 [229 Cal.Rptr. 225]; *Estate of Gelonese* (1974) 36 Cal.App.3d 854, 863 [111 Cal.Rptr. 833]; see generally 12 Witkin, Summary of Cal. Law (9th ed. 1990) Wills and Probate, §§ 187-193, pp. 216-224.) The last element—active procurement of the will—required a showing that the beneficiary actively participated in the preparation of the will; it was not enough that the beneficiary procured an attorney to draft the will if the beneficiary did not affect the contents of the will. (*Estate of Fritschi* (1963) 60 Cal.2d 367, 374-377 [33 Cal.Rptr. 264, 384 P.2d 656]; *Estate of Mann, supra,* 184 Cal.App.3d at pp. 606-608; *Estate of Straisinger* (1967) 247 Cal.App.2d 574, 585-586 [55 Cal.Rptr. 750]; *Estate of Lombardi* (1954) 128 Cal.App.2d 606, 613 [276 P.2d 67]; cf. *Estate of Auen* (1994) 30 Cal.App.4th 300, 309-311 [35 Cal.Rptr.2d 557].) "The procurement of a person to witness the will or of an attorney to draw it does not itself constitute active participation in the preparation of the will." (*Estate of Fritschi, supra,* at p. 376.)

An illustrative application of that rule, and then some, is found in *Estate of Mann, supra,* 184 Cal.App.3d 593, an opinion of Division Two of this court. There, the decedent's nephew (who, not incidentally, like Cushing here, was the decedent's conservator) urged the decedent to make a will, took her to an attorney (who was also the nephew's friend), was present at the execution of the will, and possibly discussed with decedent the revocation clause in the will. In an opinion exhaustively discussing all relevant authority, the court held that the evidence was insufficient to support the finding that the nephew actively participated in procuring execution of the will, concluding that "[t]here is absolutely no evidence [the nephew] in any way affected the dispositive contents of the will." (*Id.* at p. 608.) *Mann* went on to hold it was error to refuse the nephew's proposed jury instruction, described as a "correct statement of law" (*id.* at p. 613), which instruction included that "merely taking the testatrix to the attorney or paying for the drafting of the will" is insufficient (*id.* at p. 612).

While we recognize that *Mann* involved undue influence and the elements required to affirmatively prove it, presumption and all, and that the legislation here at issue presumptively invalidates certain transfers, the aim of this legislation is the setting where the donee is in a "unique" position to procure a gift for the donee's own gain. And just as the nephew in *Mann* did not, despite his extensive involvement with his aunt, affect the dispositive contents of the will, likewise Cushing did not cause to be transcribed any instrument involved here.

We conclude with the observation that section 21350 et seq. was the Legislature's response to some highly publicized incidents of self-dealing by an estate planning attorney in Southern California. (See fn. 9, *ante*.) The wrongs sought to be remedied were egregious to be sure, manifesting the nadir to which professionals in whom vulnerable and elderly testators placed their trust could sink. The Legislature thus acted to address the problem, to thwart those who are "uniquely positioned" to create a transfer contrary to the true intention of the testator. (See generally *Graham v. Lenzi, supra,* 37 Cal.App.4th at p. 256.) To conclude that the extent of Cushing's involvement—perhaps more accurately, lack of involvement—suffices to void the gift to him is, we conclude, neither within the spirit, nor, as demonstrated above, the letter, of section 21350.

While concluding that Cushing failed to overcome the presumption of undue influence, the trial court expressly found that Cushing did not actually engage in undue influence or any other untoward conduct. As the court remarked even while ruling against Cushing, "There is certainly no evidence that [Cushing] mistreated [the Swetmanns] or acted against their interests," a conclusion, we confirm, that is undeniable on this record. Cushing helped and supported his friends and neighbors for some 25 years, including acting as attorney in fact for Regis nearly all of those years, without incident. He handled their finances, again without incident. And he served three years as conservator, again without incident. Cushing assisted. He supported. He chauffeured. He shopped. And he companioned. What he did not do was "cause [Regis's will] to be transcribed."[10]

In summary, we hold as a matter of law on the undisputed facts that Cushing is not a person who comes within section 21350, subdivision (a). Accordingly, the trial court erred in declaring the devise to Cushing to be invalid, and the court's order must be reversed.

As is apparent from our recitation of the facts, the complete story of Regis's estate plan, beginning to end, from the first conversation to the final instruments, was in evidence. The whole story is in the record, a story that, as indicated earlier (see fn. 1, *ante*) is undisputed. The Corcorans have had their day in court, assumedly having marshalled the best case they could.

[10]In light of our interpretation of the statutory phrase "causes . . . to be transcribed," and the result it impels, we do not reach Cushing's assertion that the language of section 21350 is unconstitutionally vague, or his argument that section 21351 denied him due process. We also find it unnecessary to address Cushing's contentions that the evidence pertaining to the Brethauer matter was inadmissible or that his objections to the proposed statement of decision were timely. Finally, given that Cushing receives the residue of the estate of Regis, the surviving spouse and surviving joint tenant, it would appear that the issues of the validity of Vera's trust and the status of the bank account and annuity are moot.

"Under these circumstances, it is proper for us to direct that judgment be entered in favor of [Cushing] . . . ." (*Mid-Century Ins. Co. v. Gardner* (1992) 9 Cal.App.4th 1205, 1220 [11 Cal.Rptr.2d 918], and authorities there cited.)

## DISPOSITION

The order determining entitlement to estate distribution is reversed with directions to distribute the estate of Regis Swetmann in accordance with the terms of the will. Cushing shall recover costs on appeal.

Jones, P. J., and Stevens, J., concurred.